1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2       Including Professional Corporations
   JAMES E. CURRY, Cal. Bar No. 115769
3  jcurry@sheppardmullin.com
   VALERIE E. ALTER, Cal. Bar No. 239905
4  valter@sheppardmullin.com
   1901 Avenue of the Stars, Suite 1600
5  Los Angeles, California  90067-6017
   Telephone:  310-228-3700
6  Facsimile:  310-228-3701

7  Attorneys for Defendant
   SHED MEDIA US INC.

8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11

12 GILBERT J. ARENAS, JR., an         Case No. LACV11-5279 DMG (MRWX)
   individual,
13                                    DEFENDANT SHED MEDIA US INC.'S
                   Plaintiff,
14                                    (1)  NOTICE OF MOTION AND
        v.                                 SPECIAL MOTION TO STRIKE
15                                         PLAINTIFF'S RIGHT OF
   SHED MEDIA US INC,. a Delaware          PUBLICITY CLAIMS
16 corporation; LAURA GOVAN, an            PURSUANT TO CAL. CODE
   individual; and DOES 1 through 10,      CIV. PROC. § 425.16;
17 inclusive,
                                      (2)  MEMORANDUM OF POINTS
18                 Defendants.             AND AUTHORITIES;

19                                    (3)  DECLARATION OF ALEX
                                           DEMYANENKO;
20
                                      (4)  DECLARATION OF SCOTT
21                                         ACORD; AND

22                                    (5)  DECLARATION OF VALERIE
                                           E. ALTER
23
                                      Hearing Date:  August 29, 2011
24                                    Time:          10:00 a.m.
                                      Courtroom:     7
25
                                      [Proposed Order Lodged Concurrently
26                                    Herewith]

27                                    [Complaint Filed:  June 23, 2011]

28
   ────────────────────────────
   W02-WEST:1VEA2\403690466.4

1  TO THE ABOVE-CAPTIONED COURT AND TO PLAINTIFF AND HIS

2  COUNSEL OF RECORD:

3           PLEASE TAKE NOTICE that on Monday, August 29, 2011, at 10:00 a.m., or

4  as soon as possible thereafter as counsel can be heard in Courtroom 7 of the United

5  States Courthouse, 312 North Spring Street, Los Angeles, California 90012, before

6  the Honorable Dolly M. Gee, defendant Shed Media US Inc. will and hereby does

7  move for an order specially striking Plaintiff Gilbert J. Arenas Jr.'s ("**Plaintiff**")

8  claims for common law misappropriation and violation of California Civil Code

9  § 3344 (the "**right of publicity claims**") pursuant to California Code of Civil

10  Procedure § 425.16 (the "**anti-SLAPP statute**").

11          This motion is made on the grounds that Plaintiff's right of publicity claims

12  arise out of Shed Media's actions that (1) were taken in furtherance of its First

13  Amendment rights and (2) relate to matters of public concern.  Thus, the anti-

14  SLAPP statute applies, and Plaintiff must prove by admissible evidence that he will

15  probably prevail on each of his claims against Shed Media.  Plaintiff cannot meet

16  that burden here as to his right of publicity claims because he cannot prove that (1)

17  Shed Media used his name, likeness, or persona for commercial purposes and (2)

18  even if he could prove use of his name or likeness, Shed Media's alleged use of

19  Plaintiff's name, likeness, or persona is protected by the First Amendment to the

20  United States Constitution.

21          This Motion is based upon this Notice, the attached Memorandum Of Points

22  And Authorities, the Declaration of Scott Acord, the Declaration of Valerie E. Alter,

23  all pleadings and other documents concerning this matter contained in the Court's

24  file, those matters of which this Court may take judicial notice, and such further

25  evidence and oral argument as may be presented at the hearing on this Motion.

26          This Motion is made following the conference of counsel pursuant to C.D.

27  CAL. LOCAL RULE 7-3 that took place on July 26, 2011.

28

1  Dated:  August 1, 2011

2                      SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

3

4                      By      _____/s James E. Curry_____

5                                  JAMES E. CURRY

6                              Attorneys for Defendant
                               SHEA MEDIA US INC.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

W02-WEST:1VEA2\403690466.4

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................... 1

II.   FACTS ....................................................................................................... 4

    A.    Basketball Wives Los Angeles .......................................................... 4

    B.    Promotion Of *Basketball Wives: Los Angeles*. ............................... 4

    C.    Plaintiff's Complaint ......................................................................... 5

III.  PLAINTIFF'S RIGHT OF PUBLICITY CLAIMS SHOULD BE
      STRICKEN ............................................................................................. 7

    A.    The Anti-SLAPP Statute May Be Invoked In Federal Court. ............. 7

    B.    The Anti-SLAPP Statute Is Construed Broadly .................................. 7

    C.    The Anti-SLAPP Statute Applies To Plaintiff's Right Of
          Publicity Claims. ............................................................................... 8

          1.    The Show Is Protected By The First Amendment And
               Promotion And Advertising Thereof Is Similarly
               Protected. .......................................................................... 8

          2.    The Show And Shed Media's Promotion Thereof Is An
               Issue Of Public Interest. ................................................... 10

               a.    The Show Involves A Topic Of Widespread
                    Interest. ................................................................. 12

               b.    Plaintiff's Pleading That He Is Famous And One Of
                    The Most Well-Known Players In The NBA
                    Establishes The Applicability Of The Anti-Slapp
                    Statute. ................................................................. 13

    D.    Plaintiff Cannot Establish A Probability Of Success On His
          Right Of Publicity Claims. ............................................................... 15

          1.    Shed Media Did Not Use Plaintiff's Name, Likeness, Or
               Persona. ............................................................................ 16

2.    Use of Plaintiff's Name or Likeness In the Context Of This
      Expressive Work Is Protected The First Amendment To
      The United States Constitution. ....................................................17

      a.    The Show And Related Advertising Are Protected
            By The First Amendment. ................................................18

            (1)    The Show Relates To Matters In The Public
                   Interest. ................................................................18

            (2)    The Show Is An Expressive Work. ........................21

            (3)    Because The Show Is Protected By The First
                   Amendment, Related Advertising Is Similarly
                   Protected. .............................................................22

      b.    Plaintiff Cannot Prove That Shed Media Acted With
            Actual Malice. .................................................................23

IV.   CONCLUSION ........................................................................................25

W02-WEST:1VEA2\403690466.4

1

TABLE OF AUTHORITIES

2

Page(s)

3

<u>Federal Cases</u>

4   *Aaronson v. Dog Eat Dog Films*
5       738 F. Supp. 2d 1104 (W.D. Wash. 2010) ........................................................9, 22

6   *Abdul-Jabbar v. General Motors Corp.*
7       85 F.3d 407 (9th Cir. 1996) ........................................................24

8   *Baugh v. CBS, Inc.*
        828 F. Supp. 745 (N.D. Cal. 1993) ........................................................8, 9, 20, 21
9

    *Cher v. Forum Intern., Ltd.*
10      692 F.2d 634 (9th Cir. 1982) ........................................................9, 18, 22, 23

11  *Daly v. Viacom, Inc.*
12      238 F. Supp. 2d 1118 (N.D. Cal. 2002) ........................................................8, 10, 22

13  *Eastwood v. National Enquirer, Inc.*
14      123 F.3d 1249 (9th Cir. 1997) ........................................................23

15  *Hicks v. Casablanca Records*
16      464 F. Supp. 426 (S.D.N.Y. 1978) ........................................................9

17  *Hilton v. Hallmark*
        580 F.3d 874 (9th Cir. 2009),
18      *amended* 599 F.3d 894 (9th Cir. 2010) ........................................................7, 11, 12, 14

19  *Hoffman v. Capital Cities/ABC, Inc.*
20      255 F.3d 1180 (9th Cir. 2001) ........................................................9, 23

21  *Lee v. Penthouse International, Ltd.*
22      No. 96-7069, 1997 U.S. Dist. LEXIS 23893
        (C.D. Cal. March 18, 1997) ........................................................14, 18, 20, 21
23

24  *Mattel, Inc. v. MCA Records, Inc.*
        296 F.3d 894 (9th Cir. 2002) ........................................................24
25

    *Matthews v. Wozencraft*
26      15 F.3d 432 (5th Cir. 1994) ........................................................2, 21

27

28

*Michaels v. Internet Entertainment Group, Inc.*
   No. 98-583, 1998 U.S. Dist. LEXIS 20786
   (C.D. Cal. Sept. 10, 1998) ................................................14, 19, 20, 21

*Midler v. Ford Motor Co.*
   849 F.2d 460 (9th Cir. 1988) ..................................................16

*Nichols v. Moore*
   334 F. Supp. 2d 944 (E.D. Mich. 2004) ..............................11, 19

*O'Neil & Co., Inc. v. Validea.com Inc.*
   202 F. Supp. 2d 1113 (C.D. Cal. 2002)..................................24

*Solano v. Playgirl, Inc.*
   292 F.3d 1078 (9th Cir. 2002) ..........................................19, 20

*White v. Samsung Electronics America, Inc.*
   971 F.2d 1395 (9th Cir. 1992) ..........................................16, 17

State Cases

*Briggs v. Eden Council For Hope & Opportunity*
   19 Cal.4th 1106 (1999) .........................................................11

*Commonwealth Energy v. Investor Data Exchange* (2003)
   110 Cal.App.4th 26.........................................................11, 14

*Dora v. Frontline Video, Inc.*
   15 Cal.App.4th 536 (1993) ............................11, 12, 13, 18, 19, 21

*Eastwood v. Superior Court*
   149 Cal.App.3d 409 (1983) ...........................13, 14, 15, 19, 21

*Equilon Enterprises v. Consumer Cause, Inc.*
   29 Cal.4th 53 (2002) ............................................................8

*Gionfriddo v. Major League Baseball*
   94 Cal. App. 4th 400 (2000) ..........................9, 10, 15, 19, 21, 22

*Integrated Healthcare Holdings, Inc., v. Fitzgibbons* (2006)
   140 Cal.App.4th 515.............................................................10

*Ludwig v. Superior Court*
   37 Cal.App.4th 8 (1995) ........................................................8

*Montana v. San Jose Mercury News, Inc.*
    34 Cal.App.4th 790 (1995) ....................................................................10, 18, 22

*Nygård v. Uusi-Kerttula*
    159 Cal.App.4th 1027 (2008) ...........................................................................11

*Polydoros v. Twentieth Century Fox Film Corp.*
    67 Cal. App. 4th 318 (1997) .............................................................................15

*Seelig v. Infinity Broad. Corp.*
    97 Cal. App. 4th 798 (2002) ...............................................................................8

*Stewart v. Rolling Stone LLC*
    181 Cal. App. 4th 664 (2010) ...........................................................................23

*Varian Med. Sys., Inc. v. Delfino*
    35 Cal.4th 180 (2005) ..........................................................................................8

*Weinberg v. Feisel*
    110 Cal. App. 4th 1122 (2003) .........................................................................12

*Zhao v. Wong (1996)*
    48 Cal.App.4th 1114 ...................................................................................10, 11

Federal: Statutes, Rules, Regulations, Constitutional Provisions

15 U.S.C. § 1125 ......................................................................................................6

State: Statutes, Rules, Regulations, Constitutional Provisions

Cal. Bus. & Profs. Code § 17200.............................................................................7

Cal. Civ. Code § 3344...........................................................................1, 2, 6, 15, 16, 23

Cal. Civ. Proc. Code § 425.16 .....................................................................1, 2, 7, 8

W02-WEST:1VEA2\403690466.4

# I.

# **INTRODUCTION**

Defendant Shed Media US Inc. ("**Shed Media**") produces *Basketball Wives*, a reality television series that follows the lives of women who are or have been romantically attached to professional basketball players. The series is not about basketball, let alone basketball players. Rather, the series focuses on the women's lives and their relationships with one another, as well as their careers, personal lives, and how they have been affected by their romantic connections—past or present—to professional basketball players. Given the immense popularity of and public interest in the series—3.5 million people tuned into the premier of its third season, more than 250,000 people follow it on Twitter, and more than 350,000 people "like" it on Facebook—Shed Media is producing a spinoff, *Basketball Wives: Los Angeles* (the "**Show**"), which has not yet aired.

Plaintiff Gilbert J. Arenas, Jr. ("**Plaintiff**"), a self-described "famous" professional athlete, dated and had multiple children with defendant Laura Govan ("**Govan**"). Their relationship deteriorated in a public manner, resulting in much publicized litigation between them and Plaintiff "bashing" Govan publicly and on the radio. Govan has put her life back together and will appear on the Show. Plaintiff claims to be unhappy about Govan's appearance on the Show, and, extending his public feud with Govan, has filed this lawsuit.

Plaintiff is careful to limit his Complaint, at least at this juncture, to advertising or promotion of the Show (perhaps because the Show has not yet aired and Plaintiff lacks a good faith basis for making any claim based on the Show itself). Plaintiff even admits that the advertising and promotion of the Show as of the date that he filed his Complaint had not so much as mentioned his name. Nonetheless, the substance of Plaintiff's Complaint is that advertising for the Show impinges on his rights because the title of the Show, combined with Govan's appearance thereon, (1) misappropriates his name and likeness, (2) infringes and

diltes his trademarks, and (3) amounts to a false endorsement.  In a showing of unparalleled hubris, Plaintiff claims that he is so famous and important that simply mentioning the words "basketball wives" in the same sentence as Govan's name—even without actually mentioning Plaintiff's name—impermissibly impinges on his rights.  Essentially, Plaintiff claims that because he is famous, his ex-girlfriend is not allowed to talk about *her* life.  Plaintiff is wrong.  Govan has a constitutional right to tell her story, even were it to result in an unauthorized biography of Plaintiff.  *Matthews v. Wozencraft*, 15 F.3d 432 (5th Cir. 1994) (plaintiff's right of publicity did not override the right of his ex-wife and onetime law enforcement partner to tell the story of their undercover work in connection with a drug investigation and ultimate fall from grace into drug use and prejury).  Thus, this Court should strike Plaintiff's claims for common law misappropriation of name and likeness and violation of California Civil Code § 3344 (the **"right of publicity claims"**) pursuant to the anti-SLAPP statute, California Code of Civil Procedure § 425.16.

The anti-SLAPP statute applies wherever a plaintiff attempts to state a claim arising out of actions that a defendant takes in furtherance of its right to free speech in connection with an issue of public interest and requires a plaintiff to prove that he will probably succeed on his claims.  The anti-SLAPP statute clearly applies here because (1) the Show, and any advertising related thereto, is expressive content protected by the First Amendment and (2) the Show relates to an issue of pubic interest, as it provides a glimpse into the lives of women who are clearly interesting to the public, as demonstrated by the millions of people who tune into the series.[1]  Thus, Plaintiff's right of publicity claims must be stricken unless he can prove that he will probably succeed on the merits of those claims.  Plaintiff can make no such showing here.

---

[1] The second point would only be stronger if Plaintiff could somehow prove (he cannot) that the Show is about him, as it is blackprofessional athletes—including their romantic connections—present issues of public interest.

1    First, to state a right of publicity claim—either common law or statutory—a

2    plaintiff must prove that the defendant used his name or likeness.  Plaintiff admits

3    that Shed Media has not actually used his name or likeness, at least as of the date

4    that he filed his Complaint.  [Complaint ¶ 24.]  Plaintiff's claim that Shed Media

5    somehow used his name or likeness by implication because it hired his ex-girlfriend,

6    Govan, in connection with a show called *Basketball Wives,* cannot withstand even

7    minimal scrutiny.

8    Moreover, Plaintiff's claims are barred by the First Amendment.  A public

9    figure's right of publicity claim must fail when he or she brings a claim based on (1)

10   a publication in the public interest or (2) an expressive work, unless he or she can

11   prove by clear and convincing evidence that the defendant acted with actual malice

12   and created a false impression that the plaintiff endorsed the work.  Here, as noted

13   above, the Show and any advertising thereto is constitutionally protected as an

14   expressive work and is also in the public interest.  No reasonable person could find

15   that the Show or any advertising related thereto falsely suggests that Plaintiff

16   endorses the Show.  Plaintiff has not appeared in the Show or in its advertising, and

17   as of the date that his Complaint was filed, his name has not even been mentioned.

18   No reasonable person would assume that the Show relates to him, let alone that he

19   endorses it.  Moreover, against the backdrop of Plaintiff's tumultuous relationship

20   with Govan, anyone who knew to associate him with her would also know that her

21   appearance does not suggest any endorsement by Plaintiff—quite the opposite.

22   Because Plaintiff cannot prove that Shed Media created a false impression that he

23   endorses the Show, he cannot prove that Shed Media acted with actual malice and

24   his right of publicity claims fail.  Thus, Shed Media respectfully requests that the

25   Court grant this motion and strike Plaintiff's right of publicity claims.

26

27

28

W02-WEST:1VEA2\403690466.4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.

## FACTS

**A.    Basketball Wives Los Angeles.**

The Show is a spinoff of the successful the *Basketball Wives* series, and includes a cast of women, most of whom have or have had a romantic relationship with a professional basketball player.  That said, the Show is in no way about basketball or basketball players.  It is about the women's relationships with one another and their lives.  [Demyanenko Decl. ¶ 5.]  To the extent that basketball players are mentioned at all, they are incidental to the Show's telling its women protagonists' stories.  [Demyanenko Decl. ¶ 6.]

The Show, when it airs for the first time on August 29, 2011, will follow this precedent.  [Demyanenko Decl. ¶ 6, Ex. D.]  The Show features Govan, who is Plaintiff's ex-girlfriend and the mother of his children.  [Complaint ¶10-11, 13]

The series is incredibly popular.  More than 350,000 people "like" the series on Facebook, more than 250,000 people follow the series on Twitter, and more than 3.5 million people tuned into the premier of *Basketball Wives 3* on May 30, 2011.  [Acord Decl. ¶ 3, Ex. A at p. 1; Ex. B; Ex. C at 9.]

**B.    Promotion Of *Basketball Wives: Los Angeles*.**

As of June 23, 2011, when Plaintiff filed this action, and as of the filing date of this motion, August 1, 2011, there has been minimal publicity for the Show.  In fact, only two press releases have been issued, and the press releases do not even mention Plaintiff.  [Acord Decl. ¶ 4.]  For instance, consistent with the description of the Show, above, the first press release emphasizes that the Show is about the women:

> Elbow throwing, trash talking and in-your-face action: forget the NBA, we're talking about their wives! . . . . "Basketball Wives LA" introduces a group of dynamic women with relationships to some of the biggest basketball players in the game. "Basketball Wives LA" cast includes:

-4-

1  Kimsha Artest (wife of Ron Artest, Los Angeles Lakers), Gloria Govan

2  (fiancée of Matt Barnes, Los Angeles Lakers), *Laura Govan (sister of*

3  *Gloria Govan)* and Jackie Christie (wife of Doug Christie, former

4  player for the Los Angeles Clippers) and Imani Showalter (fiancée of

5  Stephen Jackson, Charlotte Bobcats) as well as others.

6  This 10 episode, hour-long series will dive into the real-life locker

7  room of these leading ladies, giving viewers a never-before-seen look

8  at what it takes to live in La La Land and be connected to a famous

9  professional athlete. For the most part, these women live the life with

10  the best cars, biggest mansions and hottest bling but living the high life

11  is not all glamour and often there is a price to pay. Cameras will follow

12  these women as they attempt to juggle their relationships, infidelity

13  issues, children and friendships while trying to find the perfect balance

14  between supporting their families and realizing their own career

15  ambitions. . . .

16  [Acord Decl. ¶ 9, Ex. D (emphasis added).]  Notably, the press release describes

17  Govan as the "sister of Gloria Govan," not as the ex-girlfriend of Plaintiff or the

18  mother of his children.  That said, future promotional materials could certainly refer

19  to Govan's prior relationship with Plaintiff, and as further set forth below, such use

20  would fall well within the lines of permissible use. *[Id.]*

21  **C.    Plaintiff's Complaint.**

22        Plaintiff complains that Shed Media has infringed his rights in his name and

23  likeness.  More specifically, Plaintiff alleges that he is "a professional athlete" and

24  "one of the most well-known players in the NBA." [Complaint ¶ 9.]  He further

25  claims that by providing Govan a vehicle by which to discuss *her life*, the Show and

26  Shed Media enable Govan "to use, without permission or authorization, the names

27  and/or likenesses of famous NBA professional basketball players they know on a

28  personal level for their own commercial gain." *[Id.* ¶ 13.]  Plaintiff alleges that Shed

-5-

1  Media chose Govan to appear on Show "primarily to enhance Defendants' ability to
2  market the show due to Defendant GOVAN's prior personal relationship with
3  Plaintiff and current relationship with Plaintiff as mother of the Minor Children, and
4  thus to use Plaintiffs name and/or likeness for commercial gain, without Plaintiffs
5  authorization." [*Id.* ¶ 14.]

6      In other words, Plaintiff claims that simply by virtue of Govan's appearance
7  on the Show—regardless of whether or not his name or likeness is actually used—
8  Shed Media has violated his rights:

9          While Defendants use care to avoid explicit reference to Plaintiffs
10         name in the advertisements for the "Basketball Wives: Los Angeles"
11         show, the very presence of Defendant GOVAN and the title of the
12         show is an obvious reference to Plaintiff and use of Plaintiff s likeness.

13 [Complaint ¶ 24.]  Plaintiff also alleges "on information and belief" that Shed Media
14 has "threatened" to use his name or likeness.  [Complaint ¶ 25. *See also* Complaint
15 ¶¶ 31, 37, 45, 50, 59.]

16     At least for now, Plaintiff has limited his claims to Shed Media's advertising
17 of the Show:  "The reference to Plaintiffs's likeness by Defendants is primarily
18 commercial and not communicative and not transformative, as the challenged uses
19 are Defendants' uses of Plaintiffs likeness in the ***advertising and the promotion of***
20 the 'Basketball Wives: Los Angeles' show."  [Complaint ¶ 17 (emphasis added).]

21     Based on Shed Media's use of Govan's name in its advertising and its alleged
22 "threatened" use of Plaintiffs own name and likeness in connection with promotion
23 of the Show, Plaintiff attempts to allege seven claims against Shed Media for:  (1)
24 trademark infringement of an unregistered mark, 15 U.S.C. § 1125(a), (2) trademark
25 dilution, 15 U.S.C. § 1125(c), (3) false advertising, 15 U.S.C. § 1125(a), (4) false
26 endorsement, 15 U.S.C. § 1125(a), (5) California common law misappropriation of
27 name and likeness, (6) violation of the right of publicity, Cal. Civ. Code § 3344, and
28

-6-

W02-WEST:1VEA2\403690466.4

1   (7) unfair competition, Cal. Bus. & Profs. Code § 17200.  This motion addresses

2   Plaintiff's right of publicity claims, the fifth and sixth claims.

3                                       **III.**

4   **PLAINTIFF'S RIGHT OF PUBLICITY CLAIMS SHOULD BE STRICKEN**

5   **A.      The Anti-SLAPP Statute May Be Invoked In Federal Court.**

6          A federal court may "entertain anti-SLAPP special motions to strike in

7   connection with state law claims." *Hilton v. Hallmark*, 580 F.3d 874 (9th Cir.

8   2009), *amended* 599 F.3d 894, 901 (9th Cir. 2010).  Thus, Shed Media may properly

9   move to strike Plaintiff's right of publicity claims.

10  **B.      The Anti-SLAPP Statute Is Construed Broadly.**

11         Section 425.16 was enacted to control "a disturbing increase in lawsuits

12  brought primarily to chill the valid exercise of the constitutional rights of freedom of

13  speech and petition for the redress of grievances." Cal. Civ. Proc. Code § 425.16(a).

14  To achieve that goal, the Legislature has declared that "this section shall be

15  construed broadly." *Id.*  Consistent with the broad purpose of the anti-SLAPP

16  statute, any

17         cause of action against a person arising from any act of that person in

18         furtherance of that person's right of petition or free speech under the

19         United States or California Constitution in connection with a public

20         issue shall be subject to a special motion to strike, unless the court

21         determines that the plaintiff has established that there is a probability

22         that the plaintiff will prevail on the claim.

23  Cal. Civ. Proc. Code § 425.16(b)(1).  An "act in furtherance of a person's right of

24  petition or free speech" includes "conduct in furtherance of the exercise of the

25  constitutional right of petition or the constitutional right of free speech in connection

26  with a public issue or an issue of public interest." Cal. Civ. Proc. Code

27  § 425.16(e)(4).  The anti-SLAPP statute is consistent with the policy that

28  "[s]ummary disposition is particularly favored in cases involving First Amendment

-7-

1  rights." *Baugh v. CBS, Inc.*, 828 F. Supp. 745, 752 (N.D. Cal. 1993) (citing *Okun v.*

2  *Superior Court*, 29 Cal. 3d 442, 460 (1981) for the proposition that "speedy

3  resolution of cases involving free speech is desirable to avoid a chilling effect upon

4  the exercise of First Amendment rights").

5      To determine whether § 425.16 applies, a court must undertake a two-step

6  process, as delineated in § 425.16(b). *Varian Med. Sys., Inc. v. Delfino*, 35 Cal.4th

7  180, 192 (2005).  First, "the court decides whether the defendant has made a

8  threshold showing that the challenged cause of action is one arising from protected

9  activity." *Equilon Enterprises v. Consumer Cause, Inc.*, 29 Cal.4th 53, 67 (2002).

10  Second, if the statute applies, the burden shifts to the plaintiff to demonstrate a

11  probability of success on its claims.  *Id.* at 67; Cal. Civ. Proc. Code § 425.16(b)(1).

12  To meet that burden, a plaintiff must demonstrate that his complaint is legally

13  sufficient and supported by facts sufficient to sustain a favorable judgment if the

14  evidence submitted by plaintiff is credited.  *Seelig v. Infinity Broad. Corp.*, 97 Cal.

15  App. 4th 798, 809 (2002).  The motion to strike must be granted "if the evidence

16  introduced either negates or fails to reveal the actual existence of a triable claim . . .

17  ." *Ludwig v. Superior Court*, 37 Cal.App.4th 8, 15 (1995).

18  **C.    The Anti-SLAPP Statute Applies To Plaintiff's Right Of Publicity**

19      **Claims.**

20      Plaintiff's right of publicity claims arise entirely out of Shed Media's alleged

21  promotion of the Show, which is protected by the First Amendment.  Moreover, the

22  Show, and Plaintiff—who himself alleges that he is a "famous" basketball player

23  [Complaint ¶¶ 9, 30]—are undeniably issues of public interest.  Thus, Plaintiff's

24  Complaint falls within the scope of the anti-SLAPP statute.

25      **1.    The Show Is Protected By The First Amendment And Promotion**

26          **And Advertising Thereof Is Similarly Protected.**

27      Television shows, including reality television shows, are expressive works

28  that fall within the protection of the First Amendment.  *See, e.g., Daly v. Viacom,*

-8-

W02-WEST:1VEA2\403690466.4

1   *Inc.*, 238 F. Supp. 2d 1118, 1123 (N.D. Cal. 2002) ("*Bands on the Run* is an

2   expressive work protected by the First Amendment"); *Baugh*, 828 F. Supp. at 754

3   (*Street Stories* reality television program protected by the First Amendment);

4   *Aaronson v. Dog Eat Dog Films*, 738 F. Supp. 2d 1104, 1111 (W.D. Wash. 2010)

5   ("It is beyond dispute that documentary movies involve free speech.); *Gionfriddo v.*

6   *Major League Baseball*, 94 Cal. App. 4th 400, 410 (2000) ("Entertainment features

7   receive the same constitutional protection as factual news reports."). The fact that a

8   television show is produced for profit does not change this conclusion, nor does it

9   transform the show into commercial speech that is entitled to lesser constitutional

10  protection. *Hicks v. Casablanca Records*, 464 F. Supp. 426, 432 (S.D.N.Y. 1978)

11  (movies and books are "are a constitutionally protected form of expression

12  notwithstanding that their production, distribution and exhibition is a large-scale

13  business conducted for private profit" (internal quotations omitted)). This is true

14  even where the work features a celebrity and intends to use that feature to increase

15  its circulation. As the Ninth Circuit explained in holding that an article featuring

16  actor Dustin Hoffman (but unauthorized by him) and designed to draw attention to

17  *Los Angeles Magazine* was protected by the First Amendment,

18          A printed article meant to draw attention to the for-profit magazine in

19          which it appears, however, does not fall outside of the protection of the

20          First Amendment because it may help to sell copies. While there was

21          testimony that the Hollywood issue and the use of celebrities was

22          intended in part to "rev up" the magazine's profile, that does not make

23          the fashion article a purely "commercial" form of expression.

24  *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1186 (9th Cir. 2001).

25          Moreover, where an underlying work is protected by the First Amendment,

26  advertising and promotional materials for the work are also protected. *Cher v.*

27  *Forum Intern., Ltd.*, 692 F.2d 634, 639 (9th Cir. 1982) ("Constitutional protection

28  extends to the truthful use of a public figure's name and likeness in advertising

1   which is merely an adjunct of the protected publication and promotes only the

2   protected publication." (citing *Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal. 3d

3   860, 781-72 (1979)); *Daly*, 238 F. Supp. 2d at 1123 ("As *Bands on the Run* is an

4   expressive work protected by the First Amendment, plaintiff cannot state a

5   misappropriation claim based on the use of her likeness in the program or the

6   advertisements for the program."); *Gionfriddo*, 94 Cal. App. 4th at 414 ("If a video

7   documentary contains an unconsented, though protected, use of a person's likeness,

8   there is little question that an advertisement for the documentary, containing a clip

9   of that use would be permissible."); *Montana v. San Jose Mercury News, Inc.*, 34

10  Cal.App.4th 790, 797 (1995) ("a newspaper has a constitutional right to promote

11  itself by reproducing its originally protected articles or photographs.").

12      Here, Plaintiff's claims arise out of Shed Media's alleged promotion of the

13  Show.  Because the Show—which provides a real-life look at the lives of women

14  who are or have been romantically attached to basketball players—is an expressive

15  work that is undeniably entitled to First Amendment protection, any advertising

16  thereof is also protected.  Thus, Plaintiff's claims fall within the scope of the anti-

17  SLAPP statute.

18      **2.    The Show And Shed Media's Promotion Thereof Is An Issue Of**

19              **Public Interest.**

20      The Show involves a topic of widespread interest and Plaintiff's pleading

21  establishes he is a public figure.  The mandate for broad construction of the anti-

22  SLAPP statute applies with particular force to the determination of what constitutes

23  a public issue or an issue of public interest.  The anti-SLAPP statute was amended in

24  1997 to include a mandate of broad construction largely in response to *Zhao v.*

25  *Wong*, 48 Cal.App.4th 1114 (1996), which narrowly defined what "public issues"

26  would justify the application of the anti-SLAPP statute. *See Integrated Healthcare*

27  *Holdings, Inc., v. Fitzgibbons*, 140 Cal.App.4th 515, 523 (2006) (1997 amendments

28  to the anti-SLAPP statute requiring broad construction were adopted in response to

-10-

1   *Zhao*); *Nygård v. Uusi-Kerttula*, 159 Cal.App.4th 1027, 1039-1042 (2008) (same);

2   *Briggs v. Eden Council For Hope & Opportunity*, 19 Cal.4th 1106, 116 (1999)

3   ("*Zhao* is incorrect in its assertion that the only activities qualifying for statutory

4   protection are those which meet the lofty standard of pertaining to the heart of self-

5   government.").

6           Thus, "matters in the public interest are not restricted to current events;

7   magazines and books, radio and television may legitimately inform and entertain the

8   public with the reproduction of past events, travelogues and biographies." *Dora v.*

9   *Frontline Video, Inc.*, 15 Cal.App.4th 536, 543 (1993) (internal quotations omitted).

10  *See also Nichols v. Moore*, 334 F. Supp. 2d 944, 956 (E.D. Mich. 2004) ("The scope

11  of the subject matter which may be considered of 'public interest' or 'newsworthy'

12  has been defined in the most liberal and far-reaching terms. The privilege of

13  enlightening the public is by no means limited to dissemination of news in the sense

14  of current events but extends far beyond to include all types of factual, educational,

15  and historical data, or even entertainment and amusement, concerning interesting

16  phases of human activity in general." (internal citations omitted)).  Rather, "'an issue

17  of public interest' . . . is ***any issue in which the public is interested***.  In other words,

18  the issue need not be 'significant' to be protected by the anti-SLAPP statute—it is

19  enough that it is one in which the public takes interest." *Nygård,* 159 Cal.App.4th at

20  1042 (emphasis original).  There is no need that an issue of public interest "involve

21  questions of civic concern; social or even low-brow topics may suffice." *Hilton,*

22  599 F.3d at 905 (greeting card featuring celebutante Paris Hilton in the public

23  interest).  Thus, to meet the public interest prong of the anti-SLAPP statute, it is

24  enough that (1) "[t]he subject of the statement or activity precipitating the claim was

25  a person or entity in the public eye;" (2) "[t]he statement or activity precipitating the

26  claim involved conduct that could affect large numbers of people beyond the direct

27  participants;" or (3) "[t]he statement or activity precipitating the claim involved a

28  topic of widespread, public interest." *Commonwealth Energy v. Investor Data*

-11-

1    *Exchange*, 110 Cal. App. 4th 26, 33 (2003).[2]  Applying these standards, it is clear

2    that the Show and related promotion are connected to a issue of public interest.

3                    a.      **The Show Involves A Topic Of Widespread Interest.**

4            Courts have repeatedly recognized that works providing insight into a

5    particular subculture are within the public interest.  For example, in *Chapman v.*

6    *Journal Concepts, Inc.*, the court explained:

7              Johnson's tale of his interactions with Plaintiff – including Plaintiff's

8              quirky mannerisms, quips, and colorful history – sheds light on one of

9              surfing's more intriguing personalities and, by extension, on the sport

10             and culture itself. The August/September 2006 volume of *The Surfer's*

11             *Journal* captures a sliver of the surfing subculture, fleshes out our

12             impression of a legend of the sport, illuminates the difficulties that may

13             arise when doing business in the surfing community, and provides

14             insight into the fast-growing and highly profitable board shaping

15             market. The published article, photographs, and liner notes are

16             newsworthy and relevant.

17   528 F. Supp. 2d 1081, 1097-98 (D. Hi. 2007).  *See also Dora*, 15 Cal. App. 4th at

18   543 (noting that a documentary was in the "public interest" where it was "about a

19   certain time and place in California history and, indeed, in American legend. The

20   _____

21   [2] Shed Media asserts that the test set forth in *Commonwealth* is correct.
     Nonetheless, it acknowledges that the Third District of the California Court of

22   Appeal enunciated a slightly different test in *Weinberg v. Feisel*, 110 Cal. App. 4th
     1122 (2003), which was designed to ensure that a private controversy between

23   famous people would not trigger the anti-SLAPP statute, even if the controversy
     was of interest to the public.  *See Hilton*, 599 F.3d at 906.  The distinction between

24   the tests set forth in *Commonwealth* and *Weinberg* are purely academic in this case
     because Arenas does not claim that the advertising or promotion for the Show

25   publicizes a private controversy between famous people.  Instead, Plaintiff alleges
     that it is so public that any mention of Govan in connection with the Show is a *de*

26   *facto* mention of Plaintiff.  [*See, e.g.*, Complaint ¶ 24.]  Moreover, if a simple
     greeting card featuring Paris Hilton saying her signature phrase, "that's hot", meets

27   both the *Commonwealth* and *Weinberg* tests, then surely a television show detailing
     the lives of a series of women and related advertising meets both tests, too.

28

                                              -12-

1   people who were a part of that era contributed, willingly or unwillingly, to the

2   development of a life-style that has become world-famous and celebrated in popular

3   culture.").

4         The Show, like the works at issue in *Dora* and *Chapman*, provides a glimpse

5   into a particular subculture:  the community of women living what the public

6   perceives to be glamorous lifestyles by virtue of their relationships—past or

7   present—to basketball players. [Demyanenko Decl. ¶ 3, Ex. D.]  The Show's

8   advertising provides a similar, albeit brief, glimpse into the lives of its women

9   protagonists.  [*Id.*, Ex. D (June 20, 2011 press release noting that "these women live

10  the life with the best cars, biggest mansions and hottest bling but living the high life

11  is not all glamour and often there is a price to pay. Cameras will follow these

12  women as they attempt to juggle their relationships, infidelity issues, children and

13  friendships while trying to find the perfect balance between supporting their families

14  and realizing their own career ambitions. . . .").]  By elucidating this snippet of

15  American popular culture, the Show and related advertising are no doubt in the

16  public interest and of interest to the public.  This is clear from the fact that more

17  than 350,000 people "like" Basketball Wives on Facebook, more than 250,000

18  people follow it on Twitter, and more than 3.5 million people tuned into the premier

19  of the third season of *Basketball Wives* when it aired on May 30, 2011.  [*Id.*, Exs. A-

20  C.]  Plaintiff's right of publicity claims, which arise out of Shed Media's alleged use

21  of his name and/or likeness in connection with the Show's advertising, thus fall

22  within the scope of the anti-SLAPP statute.

23          **b.**    **Plaintiff's Pleading That He Is Famous And One Of The**

24                **Most Well-Known Players In The NBA Establishes The**

25                **Applicability Of The Anti-Slapp Statute.**

26        "[T]here is a public interest which attaches to people who, by their

27  accomplishments, mode of living, professional standing or calling, create a

28  legitimate and widespread attention to their activities."  *Eastwood v. Superior Court,*

W02-WEST:1VEA2\403690466.4

1   149 Cal.App.3d 409, 422 (1983) (considering the "public interest" in the context of
2   a First Amendment defense). This public interest extends beyond such people's
3   professional accomplishments and to their personal lives. *Id.* at 423 ("We have no
4   doubt that the subject of the Enquirer article — the purported romantic involvements
5   of Eastwood with other celebrities — is a matter of public concern"); *Michaels v.*
6   *Internet Entertainment Group, Inc.*, No. 98-583, 1998 U.S. Dist. LEXIS 20786
7   (C.D. Cal. Sept. 10, 1998) ("It is clearly established that the romantic connections of
8   celebrities are newsworthy, as are business disputes and litigation arising
9   therefrom."); *Lee v. Penthouse International, Ltd.*, No. 96-7069, 1997 U.S. Dist.
10  LEXIS 23893 at * 15(C.D. Cal. March 18, 1997) ("If Clint Eastwood's sexual
11  relations with Tanya Tucker and Sandra Locke are newsworthy, then the sex life of
12  Tommy Lee and Pamela Anderson Lee is also a legitimate subject for an article by
13  *Penthouse*."). In fact, a cause of action arising out of a publication protected by the
14  First Amendment may be considered in the public interest simply because it features
15  a celebrity. *Hilton*, 599 F.3d at 907-908 (greeting card featuring Paris Hilton arises
16  out of the public interest); *Commonwealth*, 110 Cal.App.4th at 33 (public interest
17  test met where "[t]he subject of the statement or activity precipitating the claim was
18  a person or entity in the public eye").

19          Plaintiff claims that he "is a professional athlete" and "one of the most well-
20  known players in the NBA." [Complaint ¶ 9.] He further claims to be famous. [*Id.*
21  ¶ 30.] With these allegations, Plaintiff alleges that he falls within the category of
22  people "who, by their accomplishments, mode of living, professional standing or
23  calling, create a legitimate and widespread attention to their activities." *Eastwood*,
24  149 Cal.App.3d at 422. His Complaint is based entirely on Shed Media's alleged
25  references to his personal life. [*See, e.g.*, Complaint ¶ 24 (alleging that the presence
26  of Govan on the Show and its title "is an obvious reference to Plaintiff" and his
27  personal relationship with Govan), ¶ 39 (alleging in a false advertising claim
28  incorporated into his right of publicity claims "the entire premise of the show is to

-14-

1  entice viewers and potential viewers to watch the program by suggesting or

2  encouraging them to believe that they may thus learn 'insider' or confidential facts

3  and information about NBA players such as Plaintiff").] Thus, Plaintiff's Complaint

4  arises out of conduct in connection with an issue of public interest, and the anti-

5  SLAPP statute applies.

6  **D.**   **Plaintiff Cannot Establish A Probability Of Success On His Right Of**

7  **Publicity Claims.**

8      Because his right of publicity claims fall within the scope of the anti-SLAPP

9  statute, Plaintiff must prove that he will probably succeed on those claims. Plaintiff

10  can not carry this burden because there has been no actual use, and if there were a

11  use in connection with the expressive work, it would be protected by the First

12  Amendment. To prevail on a common law right of publicity claim, a plaintiff must

13  establish: (1) the defendant's use of the plaintiff's identity; (2) the appropriation of

14  the plaintiff's name or likeness to defendant's advantage, commercially or otherwise;

15  (3) lack of consent; and (4) resulting injury. *See Gionfriddo*, 94 Cal. App. 4th at

16  408; *Eastwood*, 149 Cal. App. 3d at 417-418. To prevail on a statutory claim under

17  § 3344, a plaintiff must also establish that: (5) the defendant knowingly used

18  plaintiff's name, photograph, or likeness on or in products, merchandise, or goods,

19  or for purposes of advertising or solicitation of purchases; and (6) there is a direct

20  connection between the use and the commercial purpose. *See Eastwood*, 149 Cal.

21  App. at 416 n.6 (9183) ("Section 3344 . . . requires a knowing use whereas under the

22  case law, mistake and inadvertence are not a defense against commercial

23  appropriation use . . . ."); *Polydoros v. Twentieth Century Fox Film Corp.*, 67 Cal.

24  App. 4th 318, 322 (1997) (stating that "[a]ppellant maintains that he can proceed

25  with a common law claim for invasion of privacy as well as a claim under Civil

26  Code section 3344 because respondents exploited his name and likeness for

27  commercial gain . . . . To succeed in his claims, appellant must establish a direct

28  connection between the use of his name or likeness and a commercial purpose.").

-15-

1    Plaintiff cannot prevail on his right of publicity claims because (1) Plaintiff
2  has not alleged any use of *his*, as opposed to *Govan's*, name or likeness and (2) the
3  use of his name and image in connection with an expressive work such as the Show
4  would not constitute a common law or statutory violation and the use would be
5  protected by the First Amendment.

6    **1.    Shed Media Did Not Use Plaintiff's Name, Likeness, Or Persona.**

7    Plaintiff cannot meet the first element of either a statutory or a common law
8  right of publicity claim: "use" of his name or likeness. "Use" of a name or likeness
9  for purposes of § 3344 has been strictly construed to mean use of the *plaintiff's*
10  name or likeness, not use of *someone else's* name or likeness. *Midler v. Ford Motor*
11  *Co.*, 849 F.2d 460, 463 (9th Cir. 1988) (no violation of § 3344 where "[t]he
12  defendants did not use Midler's name or anything else whose use is prohibited by
13  the statute. The voice they used was Hedwig's, not hers."). *See also White v.*
14  *Samsung Electronics America, Inc.*, 971 F.2d 1395, 1397 (9th Cir. 1992) ("Samsung
15  and Deutsch used a robot with mechanical features, and not, for example, a manikin
16  molded to White's precise features. Without deciding for all purposes when a
17  caricature or impressionistic resemblance might become a 'likeness,' we agree with
18  the district court that the robot at issue here was not White's 'likeness' within the
19  meaning of section 3344."). Here, Plaintiff himself pleads that "Defendants use care
20  to avoid explicit reference to Plaintiff's name in the advertisements for the" Show,
21  and attempts to state a claim based on Shed Media's use of *Govan's* name.
22  [Complaint ¶ 24.] Plaintiff cannot seriously contend that *Govan's* name is *his* name,
23  or that he has any right to control Govan's use of her own name. Thus, he fails to
24  allege a use for purposes of § 3344, and Shed Media's anti-SLAPP motion should be
25  granted.

26    Plaintiff's common law right of publicity claim fails for the same reason, even
27  with the looser "use" standard applied to common law right of publicity claims. *See*
28  *White*, 971 F.2d at 1398 (noting that a common law right of publicity cause of action

-16-

1  attaches to the more amorphous misappropriation of "the plaintiff's identity").

2  Plaintiff claims that the Show's use of Govan's name, in combination with the title of

3  the Show, "is an obvious reference to Plaintiff and use of Plaintiff's likeness."

4  [Complaint ¶ 24.]  In other words, Plaintiff claims that he is so famous that any

5  reference to Govan in the context of a television show amounts to a reference to him

6  and an unlawful appropriation of his name or likeness.  Plaintiff apparently believes

7  that his fame permits him to prevent Govan from using *her name* in connection with

8  anything—a television show with the word "basketball" in the title, girls' basketball

9  shoes, or even basketball shaped cookies—because she used to date him and he is a

10  famous basketball player.  No case—not even *White*, which represents the outer

11  limits of the common law right of publicity—supports the extreme stretch of the law

12  requested in Plaintiff's Complaint, and no reasonable person could find that the

13  combination of the Show's title and Govan's appearance in the Show constitutes a

14  misappropriation of Plaintiff's name or likeness.  Thus, Plaintiff cannot prevail on

15  his claim for violation of the common law right of publicity, either, and Shed

16  Media's anti-SLAPP motion should be granted.

17       **2.     Use of Plaintiff's Name or Likeness In the Context Of This**

18            **Expressive Work Is Protected The First Amendment To The**

19            **United States Constitution.**

20       Even if (1) Plaintiff could persuade this Court that the combination of the

21  Show's title and Govan's appearance on the Show constituted a use of Plaintiff's

22  name or likeness or (2) Shed Media were to refer to Plaintiff in a press release or

23  other advertising, as it did with other basketball players mentioned in the June 20,

24  2011 press release, Plaintiff's claims would still fail.  As discussed above in

25  addressing the applicability of the anti-SLAPP statute, the Show and any advertising

26  thereof is protected by the First Amendment.  Thus, Plaintiff cannot maintain his

27  right of publicity claims unless he proves that Shed Media acted with actual malice.

28  Plaintiff can make no such showing here.

-17-

a. **The Show And Related Advertising Are Protected By The First Amendment.**

The California Supreme "Court has acknowledged that 'the right of publicity has not been held to outweigh the value of free expression. Any other conclusion would allow reports and commentaries on the thoughts and conduct of public and prominent persons to be subject to censorship under the guise of preventing the dissipation of the publicity value of a person's identity.'" *Cher*, 962 F.2d at 638 (quoting *Gugliemi*, 25 Cal. 3d at 873)). The First Amendment defense to a right of publicity claim has been described in two ways: (1) a defense based on the publication of matters in the public interest, and (2) a defense based on the publication of an expressive work. Both of these formulations apply here, and act to bar Plaintiff's right of publicity claims.

(1) **The Show Relates To Matters In The Public Interest.**

There is an inherent "tension between the broad definition of commercial appropriation under California law and the values protected by the First Amendment." *Lee*, 1997 U.S. Dist. LEXIS 23893 at *11. To resolve this tension, the California courts have long held that, as a matter of First Amendment jurisprudence, that "[p]ublication of matters in the public interest, which rests on the right of the public to know and the freedom of the press to tell it, is not ordinarily actionable." *Dora*, 15 Cal. App. 4th at 542 (internal citations omitted).

The California legislature codified this exception in § 3344(d), which provides that "a use of a name, voice, signature, photograph, or likeness in connection with any news, public affairs, or sports broadcast or account, or any political campaign, shall not constitute a use for which consent is required under subdivision (a)." *Lee*, 1997 U.S. Dist. LEXIS 23893 at *11 (quoting § 3344(d)). The terms "news" and "public affairs" as used in § 3344(d) are coextensive with the protection of the publication of matters of "public interest" in connection with common law claims. *Montana*, 34 Cal. App. 4th at 793 ("Like the common law

-18-

1  cause of action, the statutory cause of action specifically exempts from liability the

2  use of a name or likeness in connection with the reporting of a matter in the public

3  interest."); *Dora*, 15 Cal. App. 4th at 546; *Eastwood*, 149 Cal. App. 4th at 421.

4  Thus, a publication is exempt from liability under either the common law or

5  statutory framework where it touches upon an issue of public interest.

6      As noted in the discussion of the applicability of the anti-SLAPP statute,

7  "matters in the public interest are not restricted to current events; magazines and

8  books, radio and television may legitimately inform and entertain the public with the

9  reproduction of past events, travelogues and biographies." *Dora*, 15 Cal. 4th

10  at 543 (internal quotations omitted).  This public interest may attach to particular

11  people, "who, by their accomplishments, mode of living, professional standing or

12  calling, create a legitimate and widespread attention to their activities." *Eastwood*,

13  149 Cal.App.3d at 422. These people include "actors and actresses, ***professional***

14  ***athletes***, [and] public officers. . . ." *Gionfriddo*, 94 Cal. App. 4th at 410 (emphasis

15  added).

16      Moreover, the public interest defense is not limited to the traditional news

17  media.  "The California courts have consistently held that newsworthiness is not

18  limited to high-minded discussion of politics and public affairs." *Michaels*, 1998

19  U.S. Dist. LEXIS 20786 at 12.  Instead, newsworthiness encompasses publications

20  made purely for "amusement." *Id.* (quoting *Shulman v. Group W Productions, Inc.*,

21  18 Cal. 4th 200, 225 (1998)).  *See also Moore*, 334 F. Supp. 2d at 956 ("The scope

22  of the subject matter which may be considered of 'public interest' or 'newsworthy'

23  has been defined in the most liberal and far-reaching terms. The privilege of

24  enlightening the public is by no means limited to dissemination of news in the sense

25  of current events but extends far beyond to include all types of factual, educational,

26  and historical data, or even entertainment and amusement, concerning interesting

27  phases of human activity in general." (internal citations omitted)).  Thus, the Courts

28  have found a wide spectrum of publications—including *Playgirl* magazine, an

-19-

1   article in *The Surfer's Journal* about an "iconic figure in the surfing world," an

2   article in *Penthouse* magazine featuring sexually explicit photos of Pamela

3   Anderson of *Baywatch* fame, a tabloid news show also featuring portions of a sex

4   tape of Anderson, and a portion of a reality television show depicting a victim's

5   rights advocate talking to a victim of domestic abuse—to be newsworthy or within

6   the public interest. *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1098 n. 8 (9th Cir.

7   2002) ("We do not accept Solano's argument that Playgirl is not a news magazine

8   and thus cannot contain content that may be deemed newsworthy. Even 'vulgar'

9   publications are entitled to such guarantees . . . . Courts are, and should be, reluctant

10  to define newsworthiness." (internal quotations omitted)); *Chapman*, 528 F. Supp.

11  2d at 1097-98 ("The August/September 2006 volume of *The Surfer's Journal*

12  captures a sliver of the surfing subculture, fleshes out our impression of a legend of

13  the sport, illuminates the difficulties that may arise when doing business in the

14  surfing community, and provides insight into the fast-growing and highly profitable

15  board shaping market. The published article, photographs, and liner notes are

16  newsworthy and relevant."); *Lee*, 1997 U.S. Dist. LEXIS 23893 at *15 ("the sex life

17  of Tommy Lee and Pamela Anderson Lee is also a legitimate subject for an article

18  by Penthouse"); *Michaels*, 1998 U.S. Dist. LEXIS 20786 at *13 (broadcast of

19  Pamela Anderson sex tape on a tabloid news show was constitutionally protected

20  because "[i]t is clearly established that the romantic connections of celebrities are

21  newsworthy, as are business disputes and litigation arising therefrom"); *Baugh*, 828

22  F. Supp. at 754 (constitutional privilege applies where "Defendants videotaped and

23  broadcast an actual event that occurred at Plaintiffs' home [counsel of domestic

24  abuse victim]. In addition, while STREET STORIES is not a traditional news show,

25  it is plainly a 'news or public affairs' broadcast in the broad sense and is therefore

26  entitled to protection.").

27        Against this backdrop, it is clear that the Show is in the public interest and

28  therefore privileged under the First Amendment and § 3344(d).  The Show follows

-20-

1  the lives of women who are, or at one point were, romantically connected to

2  basketball players "as they attempt to juggle their relationships, infidelity issues,

3  children and friendships while trying to find the perfect balance between supporting

4  their families and realizing their own career ambitions." [Acord Decl. ¶ 9, Ex. D.]

5  The Show is thus privileged because professional athletes and the auras and

6  subcultures surrounding them—including their love lives—are issues of public

7  interest. *Gionfriddo*, 94 Cal. App. 4th at 410; *Dora*, 15 Cal. App. 4th at 543, 546;

8  *Eastwood*, 149 Cal.App.3d at 423; *Lee*, 1997 U.S. Dist. LEXIS 23893 at *15;

9  *Michaels*, 1998 U.S. Dist. LEXIS 20786 at *13; *Chapman*, 528 F. Supp. 2d at 1097-

10  98.

11       This conclusion is buttressed by the fact that the Show, like the reality

12  television program at issue in *Baugh*, videotapes and broadcasts actual events that

13  take place its women protagonists' lives. *Baugh*, 828 F. Supp. at 754. Those

14  women—including Govan—have a right to tell *their* stories, even if they might

15  mention the professional athletes with whom they are or once were romantically

16  connected. Plaintiff cannot seriously contend that he has the right to prevent Govan

17  from telling her story simply because he is famous and at one time played a role in

18  her life. Govan has a constitutional right to tell her story, even if it results in an

19  unauthorized biography of Plaintiff. *Matthews v. Wozencraft*, 15 F.3d 432 (5th Cir.

20  1994) (plaintiff's right of publicity did not override the right of his ex-wife and

21  onetime law enforcement partner to tell the story of their undercover work in

22  connection with a drug investigation and ultimate fall from grace into drug use and

23  prejury).

24                    **(2)    The Show Is An Expressive Work.**

25       "Under the First Amendment, a cause of action for appropriation of another's

26  name and likeness may not be maintained against expressive works, whether factual

27  or fictional. Whether the publication involved was factual and biographical or

28  fictional, privacy rights have not been held to outweigh the value of free

-21-

1  expression." *Daly*, 238 F. Supp. 2d at 1123 (internal quotations and citations

2  omitted) (citing *Gugliemi*, 25 Cal. 3d at 871-72).  Moreover, it is "beyond dispute"

3  that documentary movies and television—including reality television—are

4  expressive works entitled to First Amendment protection.  *Aaronson*, 738 F. Supp.

5  2d at 1111 (citing *Dora*, 15 Cal. App. 4th at 544-46); *Daly*, 238 F. Supp. 2d at 1123

6  (reality show *Bands on the Run* protected by the First Amendment as an expressive

7  work).  The Show—a reality television show—is undeniably an expressive work

8  that is protected by the First Amendment.  Thus, and Plaintiff cannot maintain his

9  right of publicity claims against Shed Media based on it.

10       **(3)    Because The Show Is Protected By The First**

11              **Amendment, Related Advertising Is Similarly**

12              **Protected.**

13       As noted above in discussing the applicability of the anti-SLAPP statute,

14  where an underlying work that makes use of another's name or likeness is entitled to

15  First Amendment protection, advertising for the work is also protected.  *See Cher*,

16  962 F.2d at 638; *Daly*, 238 F. Supp. 2d at 1123; *Gionfriddo*, 94 Cal. App. 4th at

17  414; *Montana*, 34 Cal. App. 4th at 796-97.  Just as a plaintiff cannot maintain a

18  cause of action against an expressive work because it is protected by the First

19  Amendment, he cannot maintain a cause of action against advertising for the

20  expressive work.  *Cher*, 692 F.2d at 639 ("Advertising to promote a news medium,

21  accordingly, is not actionable under an appropriation of publicity theory"); *Daly*,

22  238 F. Supp. 2d at 1123 ("As *Bands on the Run* is an expressive work protected by

23  the First Amendment, plaintiff cannot state a misappropriation claim based on the

24  use of her likeness in the program or the advertisements for the program.").  Thus,

25  the fact that Plaintiff here has limited his claims to alleged "uses of Plaintiff's

26  likeness in the advertising and the promotion of the 'Basketball Wives: Los Angeles'

27  show" [Complaint ¶ 17] does not change the fact that his claims are barred by the

28  First Amendment.

W02-WEST:1VEA2\403690466.4

b.   **Plaintiff Cannot Prove That Shed Media Acted With Actual Malice.**

Because Plaintiff, allegedly "famous" and a public figure [Complaint ¶ 30], attempts to state right of publicity claims based on advertising and promotion for the Show that is protected by the First Amendment, Plaintiff must prove *by clear and convincing evidence* that Shed Media acted with actual malice in advertising the Show. *Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664 (2010) ("We conclude a defendant publisher may assert that the actual malice standard applies to claims for commercial misappropriation, whether the claims are brought under the common law or under Civil Code section 3344."); *Hoffman*, 255 F. 3d at 1187 (a plaintiff must prove actual malice by "clear and convincing evidence," which is a "heavy burden, far in excess of the preponderance sufficient for most civil litigation"); *Cher*, 692 F.2d at 639 (defendant not liable for constitutionally protected advertising unless the plaintiff shows that the defendant acted with reckless disregard for the truth). Actual malice

> does not mean ill will or 'malice' in the ordinary sense of the term. . . . Actual malice, instead, requires . . . that the statements were made with a reckless disregard for the truth. And although the concept of 'reckless disregard' 'cannot be fully encompassed in one infallible definition,' we have made clear that the defendant must have made [the decision to publish] with a 'high degree of awareness of . . . probable falsity,' or must have 'entertained serious doubts as to the truth of his publication.'"

*Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249, 1251 (9th Cir. 1997) (quoting *Harte-Hanks Communications v. Connaughton*, 491 U.S. 657, 666-67 (1989) and alterations in original). *See also Hoffman*, 255 F. 3d at 1187 ("Hoffman, a public figure, must therefore show that LAM, a media defendant, acted with 'actual malice,' that is, with knowledge that the photograph was false, or with reckless disregard for its falsity."). Thus, in this case, Plaintiff cannot prevail unless he can prove that

-23-

1  Shed Media, in advertising the show, "knowingly or recklessly falsely claimed that
2  [he] endorses" it.  *O'Neil & Co., Inc. v. Validea.com Inc.*, 202 F. Supp. 2d 1113,
3  1120 (C.D. Cal. 2002).

4       No reasonable person could conclude that the advertising for the Show falsely
5  claims that Plaintiff endorses the Show simply because Govan appears in the Show,
6  and might mention him on the Show as her ex-boyfriend and the father of her
7  children:  "Newspapers and magazines commonly use celebrities' names and
8  photographs without making endorsement contracts, so the public does not infer an
9  endorsement agreement from the use." *Abdul-Jabbar v. General Motors Corp.*, 85
10  F.3d 407 (9th Cir. 1996).  The same is true of television shows.  No reasonable
11  person would believe that Plaintiff endorses that Show simply because someone
12  mentions that Govan is Plaintiff's ex-girlfriend and the mother of his children.

13       Plaintiff's claim that the title of the Show—*Basketball Wives*—and Govan's
14  appearance thereon suggests endorsement by him [Complaint ¶¶ 24, 45] is equally
15  meritless.  Titles do not point to the source or supporter of an expressive work:

16      A title is designed to catch the eye and to promote the value of the
17      underlying work. Consumers expect a title to communicate a message
18      about the book or movie, but they do not expect it to identify the
19      publisher or producer.  If we see a painting titled 'Campbell's Chicken
20      Noodle Soup,' we're unlikely to believe that Campbell's has branched
21      into the art business. Nor, upon hearing Janis Joplin croon 'Oh Lord,
22      won't you buy me a Mercedes-Benz?,' would we suspect that she and
23      the carmaker had entered into a joint venture. A title tells us something
24      about the underlying work but seldom speaks to its origin.
25  *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 902 (9th Cir. 2002) (internal
26  citations omitted).  Similarly, a television show called *Basketball Wives* is unlikely
27  to make anyone believe that Plaintiff has entered into the television business.
28

1   The fact that no reasonable person could believe that Plaintiff endorses the
2   Show is especially true in light of Plaintiff's publicly tumultuous relationship with
3   Govan, which has been well covered by media outlets from the *Washington Post* to
4   the *Chicago Sun Times* to the sports blog www.deadspin.com.  For example, it has
5   been reported that in February 2011, (1) Govan served Plaintiff with child support
6   papers during half time of a basketball game as he walked into the locker room and
7   (2) Plaintiff "blasted" Govan on a radio show.  [Alter Decl. ¶¶ 2-5, Exs. E-G.]  Thus,
8   anyone who knows enough about Govan to know that she is Plaintiff's ex-girlfriend
9   would also know that an appearance by Govan does not suggest an endorsement
10  from Plaintiff.  In fact, it more likely suggests the opposite.  Thus, Plaintiff cannot
11  possibly meet his "heavy burden" of proving that Shed Media acted with actual
12  malice.

## IV.

## CONCLUSION

15  For the reasons explained above, Shed Media respectfully requests that the
16  Court grant its special motion to strike and strike Plaintiff's right of publicity claims.

18  Dated:  August 1, 2011

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


By          /s *James E. Curry*
            JAMES E. CURRY

            Attorneys for Defendant
            SHEA MEDIA US INC.

W02-WEST:1VEA2\403690466.4