SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
JAMES E. CURRY, Cal. Bar No. 115769
jcurry@sheppardmullin.com
VALERIE E. ALTER, Cal. Bar No. 239905
valter@sheppardmullin.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, California  90067-6017
Telephone:  310-228-3700
Facsimile:   310-228-3701

Attorneys for Defendant
SHED MEDIA US INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GILBERT J. ARENAS, JR., an individual,<br><br>           Plaintiff,<br><br>     v.<br><br>SHED MEDIA US INC,. a Delaware corporation; LAURA GOVAN, an individual; and DOES 1 through 10, inclusive,<br><br>           Defendants. | Case No. LACV11-5279 DMG (MRWX)<br><br>**DEFENDANT SHED MEDIA US INC.'S**<br><br>**(1)  MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION;**<br><br>**(2)  DECLARATION OF SCOTT ACORD;**<br><br>**(3)  DECLARATION OF ALEX DEMYANENKO;**<br><br>**(4)  DECLARATION OF DANIEL D. HELBERG; AND**<br><br>**(5)  DECLARATION OF VALERIE E. ALTER**<br><br>Hearing Date:  August 22, 2011<br>Time:            9:30<br>Courtroom:    7<br><br>[Complaint Filed:  June 23, 2011] |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................1

II.   FACTS ..................................................................................................4

    A.   Basketball Wives Los Angeles. ....................................................4

    B.   Promotion Of Basketball Wives: Los Angeles. .............................5

    C.   Plaintiff's Complaint And Motion For Preliminary Injunction. .............6

    D.   Plaintiff's Reputation And Publicizing Of The Show. ...........................7

III.  PLAINTIFF'S MOTION SHOULD BE DENIED ...........................................9

    A.   Standard For Granting A Motion For Preliminary Injunction. ...............9

    B.   The Relief Plaintiff Requests Is Outside The Scope Of His
        Complaint. ...................................................................................9

    C.   Plaintiff Cannot Establish A Likelihood Of Success On His
        Claims. .....................................................................................10

        1.   Plaintiff's Right Of Publicity Claim Fails.................................10

            a.   Shed Media Has Not Used Plaintiff's Name Or
                Likeness. ...............................................................10

            b.   Plaintiff Has Not Suffered Any Injury As A Result
                Of Shed Media's Conduct.......................................11

            c.   Plaintiff's Claims Are Barred By The First
                Amendment. ..........................................................12

                (1)   The Show Relates To Matters In The Public
                    Interest.........................................................13

                (2)   The Show Is An Expressive Work.........................16

                (3)   Because The Show Is Constitutionally
                      Protected, Related Advertising Is Similarly
                      Protected.......................................................17

-i-

            (4)      Plaintiff Cannot Prove By Clear And Convincing Evidence That Shed Media Acted With Actual Malice. ................................................ 17

      2.     Plaintiff's Trademark Infringement Claim Fails. ....................... 20

            a.     Plaintiff Has Not Pointed To Any Confusingly Similar Mark. ....................................................... 20

            b.     The Nominative Fair Use Doctrine Bars Plaintiff's Claim. ................................................................ 21

            c.     Plaintiff's Claim Is Barred By The First Amendment. ........................................................ 23

  D.    Plaintiff Cannot Establish That He Will Be Irreparably Harmed. ........ 23

  E.    The Balance Of The Hardships Favors Shed Media. ............................ 24

IV.    CONCLUSION ......................................................................................... 25

1

<u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

<u>Federal Cases</u>

4

*Aaronson v. Dog Eat Dog Films*
5
    738 F. Supp. 2d 1104 (W.D. Wash. 2010) ........................................................ 16

6

*Abdul-Jabbar v. General Motors Corp.*
    85 F.3d 407 (9th Cir. 1996) ...................................................................... 18
7

8

*Ali v. Playgirl, Inc.*
    447 F. Supp. 723 (S.D.N.Y. 1978) ............................................................ 24
9

*Alliance For The Wild Rockies v. Cottrell*
10
    632 F.3d (9th Cir. 2011) .......................................................................... 24

11

*Baugh v. CBS, Inc.*
12
    828 F. Supp. 745 (N.D. Cal. 1993) ............................................................ 15

13

*Brookfield Comm'ns v. West Coast Ent.*
14
    174 F.3d 1036 (9th Cir. 1999) .................................................................. 21

15

*Cairns v. Franklin Mint Co.*
16
    292 F.3d 1139 (9th Cir. 2002) .................................................................. 21

17

*Carson v. Here's Johnny Portable Toilets, Inc.*
    698 F.2d 831 (6th Cir. 1983) .................................................................... 11
18

19

*Century 21 Real Estate v. Sandlin*
    846 F.2d 1175 (9th Cir. 1998) .................................................................. 20
20

21

*Chapman v. Journal Concepts, Inc.*
    528 F. Supp. 2d 1081 (D. Hi. 2007) .......................................................... 14

22

*Cher v. Forum Intern., Ltd.*
23
    692 F.2d 634 (9th Cir. 1982) .............................................................. 13, 17

24

*Daly v. Viacom, Inc.*
25
    238 F. Supp. 2d 1118 (N.D. Cal. 2002) .................................................. 16, 17

26

*De Beers Mines v. United States*
    325 U.S. 212 (1945) ................................................................................ 9
27

28

W02-WEST:1VEA2\403758155.5

*Dick Clark v. America Online, Inc.*
  2000 U.S. Dist. LEXIS 17368 (C.D. Cal. Nov 30, 2000) ................................. 22

*E.S.S. Enter't 2000 v. Rock Star*
  547 F.3d 1095 (9th Cir. 2008) ........................................................................ 23

*Eastwood v. National Enquirer, Inc.*
  123 F.3d 1249 (9th Cir. 1997) ........................................................................ 18

*Elrod v. Burns*
  427 U.S. 347 (1976) ......................................................................................... 25

*Grant v. Callahan*
  2008 U.S. Dist. LEXIS 95599 (D. Ok. Nov. 24, 2008) ...................................... 9

*Kerr Corp. v. North Am. Dental Wholesalers, Inc.*
  2011 U.S. Dist. LEXIS 61779 (C.D. Cal. June 9, 2011)................................... 24

*Lee v. Penthouse International, Ltd.*
  1997 U.S. Dist. LEXIS 23893 (C.D. Cal. March 18, 1997)........................ 13, 14

*Marder v. Lopez*
  450 F.3d 445 (9th Cir. 2006) .......................................................................... 12

*Mattel, Inc. v. MCA Records, Inc.*
  296 F.3d 894 (9th Cir. 2002) ..................................................................... 19, 23

*Mattel Inc. v. Walking Mountain Prods.*
  353 F.3d 792 (9th Cir. 2003) .......................................................................... 23

*Matthews v. Wozencraft*
  15 F.3d 432 (5th Cir. 1994) ......................................................................... 3, 15

*Michaels v. Internet Entertainment Group, Inc.*
  1998 U.S. Dist. LEXIS 20786 (C.D. Cal. Sept. 10, 1998)......................... 14, 15

*Motschenbacher v. R. J. Reynolds Tobacco Co.*
  498 F.2d 821 (9th Cir. 1974) .......................................................................... 11

*Nichols v. Moore*
  334 F. Supp. 2d 944 (E.D. Mich. 2004) .......................................................... 14

*O'Neil & Co., Inc. v. Validea.com Inc.*
  202 F. Supp. 2d 1113 (C.D. Cal. 2002)........................................................... 18

W02-WEST:1VEA2\403758155.5

*Pirone v. Macmillan, Inc.*
  894 F.2d 579 (2nd Cir. 1990) ........................................................................... 21

*Playboy Enterprises, Inc. v. Welles*
  279 F.3d 796 (9th Cir. 2002) ........................................................................... 22

*Ruffin-Steinbeck v. DePasse*
  267 F.3d 457 (6th Cir. 2001) ........................................................................... 12

*Seale v. Gramercy Pictures*
  949 F. Supp. 331 (E.D.Pa. 1996) .................................................................... 12

*Shelton v. National Collegiate Athletic Ass'n*
  539 F.2d 1197 (9th Cir. 1976) ........................................................................... 9

*Solano v. Playgirl, Inc.*
  292 F.3d 1078 (9th Cir. 2002) ........................................................................ 14

*White v. Samsung Electronics America, Inc.*
  971 F.2d 1395 (9th Cir. 1992) ........................................................................ 10

*Whitehead v. Paramount Pictures Corp.*
  53 F. Supp.2d 38 (D.C. 1999) ........................................................................ 12

*Winter v. NRDC, Inc.*
  555 U.S. 7 (2008) ................................................................................... 9, 24

State Cases

*Dora v. Frontline Video, Inc.*
  15 Cal.App.4th 542 (1993) ............................................................................. 13

*Eastwood v. Superior Court*
  149 Cal.App.3d 409 (1983) ........................................................................ 13, 15

*Gionfriddo v. Major League Baseball*
  94 Cal. App. 4th 400 (2000) ................................................................. 10, 13, 15, 17

*Guglielmi v. Spelling-Goldberg Productions*
  25 Cal.3d 860 (1979) ................................................................................. 12

*Shulman v. Group W Productions, Inc.*
  18 Cal. 4th 200 (1998) ................................................................................ 14

W02-WEST:1VEA2\403758155.5

*Stewart v. Rolling Stone LLC*
    181 Cal. App. 4th 664 (2010) ................................................................................. 17

Federal Statutes

15 U.S.C. § 1125 ................................................................................................ 7, 20


State Statutes

Cal. Civ. Code § 3344 ......................................................................................... 7, 17

W02-WEST:1VEA2\403758155.5

# I. <u>INTRODUCTION</u>

Plaintiff has filed a motion for preliminary injunction seeking to enjoin the Show, set to air for the first time on August 29, 2011.  Plaintiff claims that the name of the Show—*Basketball Wives: Los Angeles*—combined with the fact that his ex-girlfriend, Govan, will appear thereon, infringes his rights in his name and likeness and infringes his unregistered trademarks therein.  In other words, Plaintiff blindly seeks to enjoin Shed Media from broadcasting the Show based on its title.  Plaintiff Gilbert J. Arenas, Jr. ("Plaintiff"), a self-described "famous" professional basketball player, claims that because he is famous, his ex-girlfriend, Defendant Laura Govan ("Govan") is not allowed to talk about her life.  Plaintiff is wrong.  Plaintiff's motion must fail for at least 3 reasons:  (1) Plaintiff cannot establish any injury, let alone irreparable harm, (2) Plaintiff cannot establish that he will likely succeed on the merits because, among other things, his claims in their entirety are barred by the First Amendment, and (3) the balance of the hardships favors Shed Media.

More specifically, Defendant Shed Media US Inc. ("**Shed Media**") produces *Basketball Wives*, a reality television series that follows the lives of women who are or have been romantically attached to professional basketball players.  The series is not about basketball, let alone basketball players.  Rather, the series focuses on the women's lives and their relationships with one another, as well as their careers, personal lives, and how they have been affected by their romantic connections—past or present—to professional basketball players.  Given the immense popularity of and public interest in the series—3.5 million people tuned into the premier of its third season, more than 250,000 people follow the series on Twitter, and more than 350,000 people "like" the series on Facebook—Shed Media is producing a spinoff, *Basketball Wives: Los Angeles* (the "**Show**"), which has not yet aired.

As to both injury and irreparable harm, the thrust of Plaintiff's motion is that the Show will result in monetary injury to him because "such a disreputable show will lessen Plaintiff's reputation for something that is otherwise completely

1   unrelated to Plaintiff."  [Motion 9:22-24.]  However, Plaintiff admits that the

2   advertising and promotion of the Show as of the date that he filed his Complaint had

3   not so much as mentioned his name.  The Show has not aired, so it could not

4   possibly have used his name or likeness on the Show at this point.

5       In fact, Plaintiff himself is the only party who has been using his name in

6   connection with the Show.  More specifically, Plaintiff stated the following on

7   Twitter on June 26, 2011:

8       • "for everybody talkin about my BM [Govan] on that tv show..i dont

9           care what she does..if she gets a job i play less money to her(SMART

10          THINKER HERE)"

11      • "most players dont know that.. 1 they cant lie about u on tv u can sue

12          the show 2 if they hav a job it lowers ur pay...so let them work"

13  In other words, Plaintiff has used his identity in connection with the Show.

14  Moreover, Plaintiff stated that he does not care—and in fact, that it is helpful to him

15  financially—that Govan will appear on the Show.  Plaintiff further acknowledges

16  the damning nature of this evidence: ***Plaintiff removed these statements*** (and some

17  of the statements described below) from his Twitter account around the time that he

18  filed this motion. Thus, he cannot possibly claim that any mention of his name in

19  connection with the Show results in damage to him.

20      Furthermore, Plaintiff cannot claim that the Show will affect his reputation

21  because it involves "cat fights" and "infidelity issues."  [Motion 9:20-24.]  Among

22  other things, Plaintiff has described his masturbatory habits on Twitter, and has

23  published a photo of himself looking under a stall in the ladies' room for the world

24  to see with the caption "I know what ur thinkn..but I dropped my phone.."excuse me

25  Ms but can u kick me my phone"hahaha" and a photo of a woman posed to look like

26  a penis as his Twitter icon; this latter photo has the superimposed title: "Women are

27  Dicks."  (Alter Decl., ¶ ¶ 15, 16, Exs. U, V and T).  It is a well-known fact that

28  Plaintiff is also a convicted felon for threatening a teammate he owed money to with

-2-

1   a gun in the locker room.  Thus, the Show could not possibly have a negative impact

2   on Plaintiff's reputation.

3       As to the merits, Plaintiff's claims fails because, among other reasons, they

4   are barred by the First Amendment.  Plaintiff claims that he is so famous and

5   important that simply mentioning the words "basketball wives" in the same sentence

6   as Govan's name—even without mentioning Plaintiff's name—violates his rights.

7   Plaintiff is wrong.  Govan has a constitutional right to tell *her* story, even were it to

8   result in an unauthorized biography of Plaintiff.  *Matthews v. Wozencraft*, 15 F.3d

9   432 (5th Cir. 1994) (plaintiff's right of publicity did not override the right of his ex-

10  wife and ex-police partner to tell the story of their undercover work and ultimate fall

11  from grace into drug use and penury).

12      Moreover, a public figure's right of publicity and trademark infringement

13  claims must fail when he or she brings a claim based on (1) a publication in the

14  public interest or (2) an expressive work, unless he or she can prove by clear and

15  convincing evidence that the defendant acted with actual malice and created a false

16  impression that the plaintiff endorsed the work.  Here, the Show and any advertising

17  related thereto is constitutionally protected.  No reasonable person could find that

18  the Show or any advertising related thereto falsely suggests that Plaintiff endorses

19  the Show.  Plaintiff has not appeared in the Show or in its advertising, and as of the

20  dates that his Complaint and the motion for preliminary injunction were filed,

21  Plaintiff has not even been mentioned.  No reasonable person would assume that the

22  Show relates to him, let alone that he endorses it.

23      This is especially true because Plaintiff's relationship with Govan deteriorated

24  publicly.  Govan's lawsuit for child support was heavily publicized, and Arenas

25  bashed her it twitter, interviews and on the radio.  Against this backdrop, anyone

26  who knew to associate Plaintiff with Govan would also know that she and Plaintiff

27  broke up and that her appearance does not suggest any endorsement by him—quite

28

-3-

1  the opposite.  Plaintiff's claims fail  because he cannot prove that Shed Media

2  created a false impression that he endorses the Show.

3       Finally, the balance of the hardships favors Shed Media.  Plaintiff has

4  admitted that the Show will benefit—not harm—him.  By contrast, enjoining the

5  Show will result in severe harm to Shed Media.  If the Show is enjoined, Shed

6  Media would likely be in breach of its production agreement, resulting in monetary

7  damages in the form of lost payments and potential monetary damages incurred as a

8  result of the breach.  Shed Media would incur non-monetary damages in the form of

9  injury to its reputation in the entertainment industry.  Moreover, any injunction

10  would have the effect of silencing Shed Media based on Plaintiff's questionable

11  claims.  Depriving Shed Media of its First Amendment rights based on such

12  unmeritorious claims would result in irreparable injury to Shed Media.  Thus, Shed

13  Media respectfully requests that the Court deny Plaintiff's motion.

## II.  FACTS

**A.    Basketball Wives Los Angeles.**

16       The Show is a spinoff of the successful *Basketball Wives* series.  The series is

17  very popular.  More than 3.5 million people tuned into the premier of *Basketball*

18  *Wives 3* on May 30, 2011, more than 350,000 people "like" the series on Facebook,

19  and more than 250,000 people follow the series on Twitter.  [Acord Decl. ¶ 3, Ex. A

20  at p. 1; Ex. B; Ex. C at 9.]

21       The series typically includes a cast of women, most of whom have or have

22  had a romantic relationship with a professional basketball player.  That said, the

23  series is in not about basketball, let alone basketball players.  It is about the women's

24  relationships with one another and their lives.  [Demyanenko Decl. ¶ 3.]  To the

25  extent that basketball players are mentioned, they are incidental to the series's telling

26  its women protagonists' stories.  [Demyanenko Decl. ¶ 4.]  The Show, when it

27  premiers on August 29, 2011, will follow this precedent, and features Govan, who is

28

1    Plaintiff's ex-girlfriend and the mother of his children.  [Demyanenko Decl. ¶ 6, Ex.

2    D; Complaint ¶¶ 10-11 .]

3    **B.**      <u>**Promotion Of Basketball Wives: Los Angeles.**</u>

4         As of June 23, 2011, when Plaintiff filed this action, and as of the filing date

5    of Plaintiff's motion, July 25, 2011, there had been minimal publicity for the Show.

6    In fact, a single press release was issued before the complaint was filed, and this

7    press release does not even mention Plaintiff:

8        Elbow throwing, trash talking and in-your-face action: forget the NBA,

9        we're talking about their wives! . . . . "Basketball Wives LA" introduces

10       a group of dynamic women with relationships to some of the biggest

11       basketball players in the game. "Basketball Wives LA" cast includes:

12       Kimsha Artest (wife of Ron Artest, Los Angeles Lakers), Gloria Govan

13       (fiancée of Matt Barnes, Los Angeles Lakers), ***Laura Govan (sister of***

14       ***Gloria Govan)*** and Jackie Christie (wife of Doug Christie, former

15       player for the Los Angeles Clippers) and Imani Showalter (fiancée of

16       Stephen Jackson, Charlotte Bobcats) as well as others.

17       This 10 episode, hour-long series will dive into the real-life locker

18       room of these leading ladies, giving viewers a never-before-seen look

19       at what it takes to live in La La Land and be connected to a famous

20       professional athlete. For the most part, these women live the life with

21       the best cars, biggest mansions and hottest bling but living the high life

22       is not all glamour and often there is a price to pay. Cameras will follow

23       these women as they attempt to juggle their relationships, infidelity

24       issues, children and friendships while trying to find the perfect balance

25       between supporting their families and realizing their own career

26       ambitions. . . .

27    [Acord Decl. ¶ 9, Ex. D (emphasis added).]  Notably, the press release describes

28    Govan as the "sister of Gloria Govan," not as the ex-girlfriend of Plaintiff or the

1  mother of his children.  Another recent press release was issued, which release also

2  does not mention Gilbert Arenas.  [*Id.*] That said, future promotional materials could

3  certainly refer to Govan's prior relationship with Plaintiff, and as further set forth

4  below, such use would fall well within the lines of permissible use.  [*Id.*]

5  **C.**     **Plaintiff's Complaint And Motion For Preliminary Injunction.**

6          Plaintiff complains that Shed Media has infringed his rights in his name and

7  likeness through the advertising and promotion.  Then, in this motion, Plaintiff

8  impermissibly attempts to enjoin not only the promotion, *but the Show itself.*  More

9  specifically, Plaintiff alleges that he is "a professional athlete" and "one of the most

10  well-known players in the NBA."  [Complaint ¶ 9.]  He further claims that by

11  providing Govan a vehicle by which to discuss ***her life***, the Show and Shed Media

12  enable Govan to use "the names and/or likenesses of famous NBA professional

13  basketball players they know on a personal level for their own commercial gain."

14  [*Id.* ¶ 13.]  Plaintiff alleges that Shed Media chose Govan to appear on the Show

15  "primarily to enhance Defendants' ability to market the show due to Defendant

16  GOVAN's prior personal relationship with Plaintiff and current relationship with

17  Plaintiff as mother of the Minor Children, and thus to use Plaintiffs name and/or

18  likeness for commercial gain. . . "  [*Id.* ¶ 14.]

19          In other words, Plaintiff claims that simply by virtue of Govan's appearance

20  on the Show—regardless of whether or not his name or likeness is actually used—

21  Shed Media has violated his rights:

22          While Defendants use care to avoid explicit reference to Plaintiffs

23          name in the advertisements for the "Basketball Wives: Los Angeles"

24          show, the very presence of Defendant GOVAN and the title of the

25          show is an obvious reference to Plaintiff and use of Plaintiff s likeness.

26  [Complaint ¶ 24.]  Plaintiff also alleges "on information and belief" that Shed Media

27  has "threatened" to use his name or likeness.  [*Id.* ¶ 25.]

28

Plaintiff's Complaint is limited to advertising:  "The reference to Plaintiff's likeness by Defendants is primarily commercial and not communicative and not transformative, as the challenged uses are Defendants' uses of Plaintiff's likeness in the ***advertising and the promotion of*** the 'Basketball Wives: Los Angeles' show." [Complaint ¶ 17 (emphasis added).]

Based on Shed Media's use of Govan's name in its advertising and its alleged "threatened" use of Plaintiff's own name and likeness, Plaintiff attempts to allege seven claims against Shed Media for:  (1) trademark infringement, 15 U.S.C. § 1125(a), (2) trademark dilution, 15 U.S.C. § 1125(c), (3) false advertising, 15 U.S.C. § 1125(a), (4) false endorsement, 15 U.S.C. § 1125(a), (5) common law misappropriation of name and likeness, (6) violation of the right of publicity, Cal. Civ. Code § 3344, and (7) unfair competition, Cal. Bus. & Profs. Code § 17200.

Plaintiff filed a motion for preliminary injunction in connection with his first claim for trademark infringement and his fifth claim for violation of the common law right of publicity, seeking to enjoin Shed Media from (1) mentioning his name in connection with the Show—either in advertising or on the Show itself, (2) airing the Show with Govan in it, or (3) airing any show in which Govan appears along with other women who are romantically linked to basketball players.  In stark contrast to his Complaint, Plaintiff impermissibly seeks to enjoin advertising ***and*** the Show itself.

**D.**      **Plaintiff's Reputation And Publicizing Of The Show.**

Plaintiff claims that the Show will somehow injure his reputation and result in financial injury to him because he will be associated with "cat fights."  [Motion 9:20-24.]  Plaintiff omits critical facts from his moving papers.

First, it is hard to understand how an association with "cat fights" will damage Plaintiff's reputation, when Plaintiff has been associated with potential gun fights. More specifically, Plaintiff made national sports headlines—everywhere from the *New York Post* to the *Los Angeles Times*—last Christmas when he drew a gun on

1  another player in the locker room because of a dispute over gambling debts, and

2  ultimately pled guilty to gun charges.  [Alter Decl. ¶¶ 2, 3, Exs. F, G.]

3       Second, Plaintiff, using his Twitter account, publicizes his private life and

4  views—which are often crude and/or offensive—on the world stage.  For example,

5  Plaintiff recently made headlines for tweeting while on a blind date.  [Alter Decl. ¶¶

6  4-6, Exs. H-J.]  Plaintiff stated, among other things, "Got hooked up on a blind

7  date..and I guess she was blind when she picked out this outfit ..OMG I thought she

8  was the queen of ZAMUNDA" and included a photo of his date for the world to see.

9  [Alter Decl. ¶¶ 11-12, Exs. O, Q .]  He also commented about his date's weight and

10  her eating habits, stating "this dragon can eat" and proclaiming that his date was

11  "lookin like a thunder cat."  [*Id.*]  Plaintiff has further stated on Twitter that he

12  masturbates before going out clubbing, commented that large groups of women

13  smell like "fish fillet sandwiches," has made "jokes" about children in special

14  education, and has posted on his Twitter account a photo of himself peering under

15  the stall in the women's restroom and photo of a woman posted to look like a penis,

16  with the logo "Women are Dicks."   [Alter Decl. ¶¶ 11-12, 15, Exs. O-Q, T-V.]

17       Finally, Plaintiff has associated himself with the Show by tweeting about

18  Govan's appearance on the Show, including the following:

19         • "for everybody talkin about my BM [Govan] on that tv show..i dont

20           care what she does..if she gets a job i play less money to her(SMART

21           THINKER HERE)"

22         • "most players dont know that.. 1 they cant lie about u on tv u can sue

23           the show 2 if they hav a job it lowers ur pay...so let them work"

24         • "Sumbody tell tmz.I care more about watchn ppl plank then my ex on

25           tv.PS i almost got away with plankn on the luggage screener at the

26           airport"

27  [Alter Decl. ¶¶ 11-12, Exs. P-Q.]  In other words, Plaintiff has stated that Govan's

28  appearance on the Show will benefit him.  In a damning admission, between July

22, 2011 and July 27, 2011—concurrent with the filing of his motion for preliminary injunction—***these statements were deleted from his Twitter account***. [Alter Decl. ¶ 14, Ex. S.]

### III.  PLAINTIFF'S MOTION SHOULD BE DENIED

**A.  Standard For Granting A Motion For Preliminary Injunction.**

A preliminary injunction is an "extraordinary remedy" and should not issue as of right.  *Shelton v. National Collegiate Athletic Ass'n*, 539 F.2d 1197, 1199 (9th Cir. 1976).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

**B.  The Relief Plaintiff Requests Is Outside The Scope Of His Complaint.**

The four corners of a plaintiff's complaint delineate the outer boundaries of any relief—including injunctive relief—that a plaintiff may obtain.  In other words, an injunction cannot "deal[] with a matter lying wholly outside the issues in the suit."  *De Beers Mines V. United States*, 325 U.S. 212, 220 (1945).  Thus, where a plaintiff seeks injunctive relief based on allegations outside the four corners of his complaint, the request for injunctive relief should be denied.  *See, e.g., Grant v. Callahan*, No. 07-965, 2008 U.S. Dist. LEXIS 95599 (D. Ok. Nov. 24, 2008) ("Where a movant seeks injunctive relief beyond the claims in a complaint, the Court has no power to issue a preliminary injunction.").

Plaintiff specifically limits his Complaint to advertising and promotion:  "The reference to Plaintiff's likeness by Defendants is primarily commercial and not communicative and not transformative, as ***the challenged uses are Defendants' uses of Plaintiff's likeness in the advertising and the promotion of the 'Basketball Wives: Los Angeles' show***."  [Complaint ¶ 17 (emphasis added).]  However, in his motion, Plaintiff impermissibly seeks broad injunctive relief enjoining Shed Media from (1) mentioning his name in connection with the Show itself, (2) airing the

Show with Govan in it, or (3) airing any show in which Govan appears along with other women who are romantically linked to basketball players.  The language of the requested injunction seeks relief outside the scope of his Complaint, which alone is reason to deny his motion.

**C.**   **Plaintiff Cannot Establish A Likelihood Of Success On His Claims.**

      **1.**   **Plaintiff's Right Of Publicity Claim Fails**

Plaintiff's right of publicity claim fails because (1) Shed Media has not used his name, likeness, or identity, (2) Plaintiff has not suffered any injury, and (3) Shed Media's activities are protected by the First Amendment.

      **a.**   **Shed Media Has Not Used Plaintiff's Name Or Likeness.**

To prevail on a common law right of publicity claim, a plaintiff must establish: (1) the defendant's use of the plaintiff's identity; (2) the appropriation of the plaintiff's name or likeness to defendant's advantage; (3) lack of consent; and (4) resulting injury.  *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 408 (2000).  Plaintiff cannot prevail on his right of publicity claim because (1) Plaintiff has not alleged any use of *his*, as opposed to *Govan's*, name or likeness.

Plaintiff pleads that "Defendants use care to avoid explicit reference to Plaintiff's name in the advertisements for the" Show, but nonetheless attempts to state a claim based on Shed Media's use of *Govan's* name, claiming that the Show's use of Govan's name, in combination with the title of the Show, "is an obvious reference to Plaintiff and use of Plaintiff's likeness."  [Complaint ¶ 24.]  In other words, Plaintiff claims that he is so famous that any reference to Govan in the context of a television show amounts to a reference to him and an unlawful appropriation of his name or likeness.  Plaintiff apparently believes that his fame permits him to prevent Govan from using *her name* in connection with anything—a television show with the word "basketball" in the title, girls' basketball shoes, or even basketball shaped cookies—because she used to date him and he is a famous basketball player.  No case—not even *White v. Samsung Electronics America, Inc.*,

1    971 F.2d 1395 (9th Cir. 1992), *Motschenbacher v. R. J. Reynolds Tobacco Co.*, 498

2    F.2d 821, 822 (9th Cir. 1974), or *Carson v. Here's Johnny Portable Toilets, Inc.*,

3    698 F.2d 831, 837 (6th Cir. 1983), upon which Plaintiff relies and which represent

4    the outer limits of the common law right of publicity [Motion 6:1-7:12]—supports

5    the extreme stretch of the law that Plaintiff requests.  No reasonable person could

6    find that the combination of the Show's title and Govan's appearance in the Show

7    constitutes a misappropriation of Plaintiff's name or likeness, or even his identity.  If

8    anything, the Show represents Govan's right to use ***her*** identity.

9        Plaintiff's argument that "other media outlets" mentioned Plaintiff's name

10   when reporting on Govan's appearance in the Show does not change this conclusion.

11   [Motion 7:25-27.]  The fact that third parties referenced the undisputed fact that

12   Plaintiff is Govan's ex-boyfriend and the father of her children in news stories about

13   the Show does not mean that *Shed Media* improperly used Plaintiff's name, likeness,

14   or identity.  Thus, Plaintiff's right of publicity claim fails.

15        **b.    Plaintiff Has Not Suffered Any Injury As A Result Of Shed**

16        **Media's Conduct.**

17        Plaintiff himself has admitted that the Show has helped—not harmed—his

18   interests:  "for everybody talkin about my BM [Govan] on that tv show..i dont care

19   what she does..if she gets a job i play less money to her(SMART THINKER

20   HERE)."  In other words, Govan's appearance on the Show is helpful to Plaintiff

21   because her making money results in lower child support payments to him.

22        Moreover, Plaintiff cannot seriously contend that the Show "may induce

23   humiliation, embarrassment and mental distress" because it includes "cat fights."

24   [Motion 9:13-24.]  Plaintiff himself has said that he does not care if Govan appears

25   on the Show and went as far as to state that the series "makes [him] laugh."  [Alter

26   Decl. ¶¶ 11-12, Exs. P-Q.]  Thus, any claim that he is mentally distressed because of

27   Govan's appearance is unfounded as inconsistent with Plaintiff's public statements.

28

1    Furthermore, Plaintiff is no choir boy.  He brought a gun into the locker room

2    and pled guilty to gun charges.  [Alter Decl. ¶¶ 2-3, Ex. F-G.]  He has also

3    announced to the world that (1) he masturbates before going out clubbing, (2) he

4    thinks that "500 +girls in one buildin thats gonna smell like FISH FILLET

5    SANDWICHES", (3) has made a series of "jokes" about special education, and (4)

6    has posted a photo of himself peering under the stall in the women's restroom and a

7    photo of a woman posted to look like a penis with a legend stating "Women are

8    Dicks."  Alter Decl. ¶¶ 11-12, 15-16, Exs. O-R, T, U, V.]  Against this backdrop, no

9    reasonable person could find that the fact that Plaintiff's ex-girlfriend appears on the

10   Show will cause him mental distress or reputational harm.  The power of the

11   statements that appear on Plaintiff's Twitter page is confirmed by the fact that many

12   of them were deleted concurrently with the filing of this motion.  [Alter Decl. ¶¶ 13-

13   14, Exs. R-S.] [1]

14        **c.    <u>Plaintiff's Claims Are Barred By The First Amendment.</u>**

15        The California Supreme "Court has acknowledged that 'the right of publicity

16   has not been held to outweigh the value of free expression.  Any other conclusion

17   would allow reports and commentaries on the thoughts and conduct of public and

18   _____

19   [1] Plaintiff cites *Marder v. Lopez*, 450 F.3d 445, 452 (9th Cir. 2006), for the
     proposition that Plaintiff is entitled to be compensated for a use of his life story.

20   [Motion 9:5-19.]  *Marder* did not consider whether a person has a right to be
     compensated for his or her life story.  Rather, it considered the scope and

21   enforceability of a contract between the plaintiff and a movie studio.  Moreover,
     cases that have actually considered the issue that Plaintiff raises have emphatically

22   held that a person does not have an exclusive right in her or her life story.  On the
     contrary, the courts have long held that there is no right to compensation for one's

23   life story.  *See, e.g., Gugliemi v. Spelling-Goldberg Productions*, 25 Cal.3d 860
     (1979) (no actionable right of publicity claim based on unauthorized biography of

24   movie star); *Ruffin-Steinback v. DePasse*, 267 F.3d 457 (6th Cir. 2001) (no right of
     publicity claim based on an unauthorized film about the life of the lead singer of the

25   Temptations); *Whitehead v. Paramount Pictures Corp.*, 53 F. Supp.2d 38, 53 (D.C.
     1999) ("there is no tort for invasion of privacy for appropriating the story of another

26   person's life."); *Seale v. Gramercy Pictures*, 949 F. Supp. 331, 337  (E.D.Pa. 1996)
     ("a public figure has no exclusive rights to his or her own life story, and others need
     no consent or permission of the subject to write a biography of a celebrity.").

27

28

W02-WEST:1VEA2\403758155.5

1  prominent persons to be subject to censorship under the guise of preventing the
2  dissipation of the publicity value of a person's identity.'" *Cher v. Forum Intern.,*
3  *Ltd.*, 692 F.2d 634, 638 (9th Cir. 1982) (quoting *Gugliemi*, 25 Cal. 3d at 873)).  The
4  First Amendment defense to a right of publicity claim has been described in two
5  ways:  (1) a defense based on the publication of matters in the public interest and (2)
6  a defense based on the publication of an expressive work.  Both of these
7  formulations apply here, and act to bar Plaintiff's right of publicity claim.  Both of
8  these formulations apply here, and act to bar Plaintiff's right of publicity claim
9  unless Plaintiff proves that Shed Media acted with actual malice.  Plaintiff can make
10  no such showing here.

**(1)      The Show Relates To Matters In The Public Interest.**

12      There is an inherent "tension between the broad definition of commercial
13  appropriation under California law and the values protected by the First
14  Amendment." *Lee v. Penthouse International, Ltd.*, No. 96-7069, 1997 U.S. Dist.
15  LEXIS 23893 at *11 (C.D. Cal. March 18, 1997).  To resolve this tension, the
16  California courts have long held that that "[p]ublication of matters in the public
17  interest, which rests on the right of the public to know and the freedom of the press
18  to tell it, is not ordinarily actionable." *Dora v. Frontline Video, Inc*., 15 Cal.App.4th
19  542 (1993) (internal citations omitted).

20      "[M]atters in the public interest are not restricted to current events; magazines
21  and books, radio and television may legitimately inform and entertain the public
22  with the reproduction of past events, travelogues and biographies." *Dora*, 15 Cal.
23  App. 4th at 543 (internal quotations omitted).  The public interest attaches to people,
24  "who, by their accomplishments, mode of living, professional standing or calling,
25  create a legitimate and widespread attention to their activities." *Eastwood v.*
26  *Superior Court*, 149 Cal.App.3d 409, 422 (1983).  These people include
27  "***professional athletes***." *Gionfriddo*, 94 Cal. App. 4th at 410 (emphasis added).
28

-13-

1    Moreover, the public interest defense is not limited to the traditional news

2    media.  "The California courts have consistently held that newsworthiness is not

3    limited to high-minded discussion of politics and public affairs."  *Michaels v.*

4    *Internet Entertainment Group, Inc.*, No. 98-583, 1998 U.S. Dist. LEXIS 20786  at

5    *12 (C.D. Cal. Sept. 10, 1998).  Instead, newsworthiness encompasses publications

6    made purely for "amusement."  *Id.* (quoting *Shulman v. Group W Productions, Inc.*,

7    18 Cal. 4th 200, 225 (1998)).  *See also Nichols v. Moore*, 334 F. Supp. 2d 944, 956

8    (E.D. Mich. 2004) ("The scope of the subject matter which may be considered of

9    'public interest' or 'newsworthy' has been defined in the most liberal and far-reaching

10    terms. The privilege of enlightening the public. . . extends far beyond to include all

11    types of factual, educational, and historical data, or even entertainment and

12    amusement, concerning interesting phases of human activity in general." (internal

13    citations omitted)).  Thus, the Courts have found a wide spectrum of publications—

14    including (1) *Playgirl* magazine, (2) an article in *The Surfer's Journal* about an

15    "iconic figure in the surfing world," (3) an article in *Penthouse* magazine featuring

16    sexually explicit photos of Pamela Anderson of *Baywatch* fame, (4) a tabloid news

17    show also featuring portions of a sex tape of Anderson, and (5) a portion of a reality

18    television show depicting a victim's rights advocate talking to a victim of domestic

19    abuse—to be newsworthy or within the public interest.  *See*, respectively, *Solano v.*

20    *Playgirl, Inc.*, 292 F.3d 1078, 1098 n. 8 (9th Cir. 2002) ("We do not accept Solano's

21    argument that Playgirl is not a news magazine and thus cannot contain content that

22    may be deemed newsworthy. Even 'vulgar' publications are entitled to such

23    guarantees . . . . Courts are, and should be, reluctant to define newsworthiness."

24    (internal quotations omitted)); *Chapman v. Journal Concepts, Inc.*, 528 F. Supp. 2d

25    1081, 1097-98 (D. Hi. 2007) ("The August/September 2006 volume of *The Surfer's*

26    *Journal* captures a sliver of the surfing subculture. . . . The published article,

27    photographs, and liner notes are newsworthy and relevant."); *Lee*, 1997 U.S. Dist.

28    LEXIS 23893 at *15 ("the sex life of Tommy Lee and Pamela Anderson Lee is also

-14-

a legitimate subject for an article by Penthouse"); *Michaels*, 1998 U.S. Dist. LEXIS 20786 at *13 (broadcast of Pamela Anderson sex tape on a tabloid news show was constitutionally protected because "[i]t is clearly established that the romantic connections of celebrities are newsworthy, as are business disputes and litigation arising therefrom"); *Baugh v. CBS, Inc.*, 828 F. Supp. 745, 754 (N.D. Cal. 1993) (constitutional privilege applies where "Defendants videotaped and broadcast an actual event that occurred at Plaintiffs' home [counseling of domestic abuse victim]. . . . [W]hile STREET STORIES is not a traditional news show, it is plainly a 'news or public affairs' broadcast in the broad sense").

Against this backdrop, it is clear that the Show is in the public interest and therefore privileged under the First Amendment.  The Show follows the lives of women who are, or at one point were, romantically connected to basketball players "as they attempt to juggle their relationships, infidelity issues, children and friendships while trying to find the perfect balance between supporting their families and realizing their own career ambitions."  [Accord Decl. ¶ 9, Ex. D.]  The Show is thus privileged because professional athletes and the auras and subcultures surrounding them—including their love lives—are issues of public interest. *Gionfriddo*, 94 Cal. App. 4th at 410; *Eastwood*, 149 Cal.App.3d at 423.

This conclusion is buttressed by the fact that the Show, like the reality television program at issue in *Baugh*, videotapes and broadcasts actual events that take place its women protagonists' lives.  *Baugh*, 828 F. Supp. at 754.  Those women—including Govan—have a right to tell *their* stories, even if they might mention the professional athletes with whom they are or once were romantically connected.  Plaintiff does not have the right to prevent Govan from telling her story simply because he is famous and at one time played a role in her life.  Govan has a constitutional right to tell her story, even if it results in an unauthorized biography of Plaintiff.  *Matthews v. Wozencraft*, 15 F.3d 432 (5th Cir. 1994) (plaintiff's right of

publicity did not override the right of his ex-wife and ex-police partner to tell the story of their undercover work and ultimate drug use and perjury conviction).

Plaintiff claims that the Show is not protected by the First Amendment because Plaintiff's "identity is used solely to attract attention to the show, and Plaintiff is not at all related to the show." [Motion 10:16-19.] Plaintiff's argument makes little sense. In a later portion of his brief, Plaintiff states, "Plaintiff's fame and success in his basketball career is also directly related to the 'Basketball Wives' show." [Motion 17:1-4.] Plaintiff cannot have it both ways. Regardless, the Show is about women with romantic connections—past or present—to professional athletes. Plaintiff is admittedly a professional athlete and is Govan's ex-boyfriend and the father of her children. To suggest that the Show is totally unrelated to Plaintiff—as perhaps a documentary about sea creatures would be—is unreasonable.

### (2)   The Show Is An Expressive Work.

"Under the First Amendment, a cause of action for appropriation of another's name and likeness may not be maintained against expressive works, whether factual or fictional. Whether the publication involved was factual and biographical or fictional, privacy rights have not been held to outweigh the value of free expression." *Daly v. Viacom, Inc.*, 238 F. Supp. 2d 1118, 1123 (N.D. Cal. 2002) (internal quotations and citations omitted) (citing *Gugliemi*, 25 Cal. 3d at 871-72). Moreover, it is "beyond dispute" that documentary movies and television— including reality television—are expressive works entitled to First Amendment protection. *Aaronson v. Dog Eat Dog Films*, 738 F. Supp. 2d 1104, 1111 (W.D. Wash. 2010) (citing *Dora*, 15 Cal. App. 4th at 544-46); *Daly*, 238 F. Supp. 2d at 1123 (reality show *Bands on the Run* protected by the First Amendment as an expressive work). The Show—a reality television show—is undeniably an expressive work that is protected by the First Amendment. Thus, and Plaintiff cannot maintain a right of publicity claim against Shed Media based on it.

W02-WEST:1VEA2\403758155.5

**(3)**     **Because The Show Is Constitutionally Protected,**
**Related Advertising Is Similarly Protected.**

Where an underlying work that makes use of another's name or likeness is entitled to First Amendment protection, advertising for the work is also protected. *See Cher*, 962 F.2d at 638; *Daly*, 238 F. Supp. 2d at 1123; *Gionfriddo*, 94 Cal. App. 4th at 414.  Just as a plaintiff cannot maintain a cause of action against an expressive work because it is protected by the First Amendment, he cannot maintain a cause of action against advertising for the expressive work.  *Cher*, 692 F.2d at 639 ("Advertising to promote a news medium, accordingly, is not actionable under an appropriation of publicity theory"); *Daly*, 238 F. Supp. 2d at 1123 ("As *Bands on the Run* is an expressive work protected by the First Amendment, plaintiff cannot state a misappropriation claim based on the use of her likeness in the program or the advertisements for the program.").

**(4)**     **Plaintiff Cannot Prove By Clear And Convincing**
**Evidence That Shed Media Acted With Actual Malice.**

Because Plaintiff, allegedly "famous" and a public figure [Complaint ¶ 30], attempts to state a common law right of publicity claim based on advertising and promotion for the Show that is protected by the First Amendment, Plaintiff must prove ***by clear and convincing evidence*** that Shed Media acted with actual malice in advertising the Show.  *Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664 (2010) ("We conclude a defendant publisher may assert that the actual malice standard applies to claims for commercial misappropriation, whether the claims are brought under the common law or under Civil Code section 3344."); *Hoffman*, 255 F. 3d at 1187 (a plaintiff must prove actual malice by "clear and convincing evidence," which is a "heavy burden, far in excess of the preponderance sufficient for most civil litigation"); *Cher*, 692 F.2d at 639 (defendant not liable for constitutionally protected advertising unless the plaintiff shows that the defendant acted with reckless disregard for the truth).  Actual malice

-17-

1    does not mean ill will or malice in the ordinary sense of the term. . . .

2    Actual malice, instead, requires . . . that the statements were made with

3    a reckless disregard for the truth. And although the concept of reckless

4    disregard cannot be fully encompassed in one infallible definition, we

5    have made clear that the defendant must have made [the decision to

6    publish] with a high degree of awareness of . . . probable falsity, or

7    must have entertained serious doubts as to the truth of his publication.'"

8    *Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249, 1251 (9th Cir. 1997) (internal

9    quotations omitted and alterations in original). Thus, Plaintiff cannot prevail unless

10   he can prove that Shed Media "knowingly or recklessly falsely claimed that [he]

11   endorses" the Show. *O'Neil & Co., Inc. v. Validea.com Inc.*, 202 F. Supp. 2d 1113,

12   1120 (C.D. Cal. 2002).

13       No reasonable person could conclude that the advertising for the Show falsely

14   claims that Plaintiff endorses the Show simply because Govan appears in the Show,

15   and might mention him on the Show as her ex-boyfriend and the father of her

16   children. "Newspapers and magazines commonly use celebrities' names and

17   photographs without making endorsement contracts, so the public does not infer an

18   endorsement agreement from the use." *Abdul-Jabbar v. General Motors Corp.*, 85

19   F.3d 407 (9th Cir. 1996). The same is true of television shows. No reasonable

20   person would believe that Plaintiff endorses that Show simply because someone

21   mentions that Govan is Plaintiff's ex-girlfriend and the mother of his children.

22       Plaintiff's claim that the title of the Show—*Basketball Wives*—and Govan's

23   appearance thereon suggests endorsement by him [Complaint ¶¶ 24, 45] is equally

24   meritless. Titles do not point to the source or supporter of an expressive work.

25   Consumers expect a title to communicate a message about the book or

26   movie, but they do not expect it to identify the publisher or producer.

27   If we see a painting titled 'Campbell's Chicken Noodle Soup,' we're

28   unlikely to believe that Campbell's has branched into the art business.

-18-

> Nor, upon hearing Janis Joplin croon 'Oh Lord, won't you buy me a
> Mercedes-Benz?,' would we suspect that she and the carmaker had
> entered into a joint venture. A title tells us something about the
> underlying work but seldom speaks to its origin.

*Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 902 (9th Cir. 2002) (internal citations omitted).  Similarly, a television show called *Basketball Wives* is unlikely to make anyone believe that Plaintiff has entered into the television business.

The fact that no reasonable person could believe that Plaintiff endorses the Show is especially true in light of Plaintiff's publicly tumultuous relationship with Govan, which has been covered by media outlets from the *Washington Post* to the *Chicago Sun Times* to the sports blog www.deadspin.com.  For example, it has been reported that in February 2011, (1) Govan served Plaintiff with child support papers during half time of a basketball game as he walked into the locker room and (2) Plaintiff "blasted" Govan on a radio show.  [Alter Decl. ¶¶ 7-10, Exs. K-N.]  Thus, anyone who knows enough about Govan to know that she is Plaintiff's ex-girlfriend would also know that an appearance by Govan does not suggest an endorsement from Plaintiff.  In fact, it more likely suggests the opposite.

Plaintiff argues that Shed Media acted with actual malice because "Defendants' very marketing campaign is premised on delivering a behind-the-scenes look into Plaintiff's life, even if it is allegedly from Govan's perspective." [Motion 12:2-4, 12:27-13:5.]  For this proposition, Plaintiff cites to the June 22 press release.  That press release, however, belies Plaintiff's characterization.  It states that the Show "will dive into the real-life locker room *of these leading ladies*, giving viewers a never-before-seen look at what it takes to live in La La Land and be connected to a famous professional athlete. . . . *Cameras will follow these women* as they attempt to juggle their relationships, infidelity issues, children and friendships while trying to find the perfect balance between supporting their families and realizing their own career ambitions."  [cite (emphasis added).]  In other words,

-19-

1  the press release makes clear that the Show is about the **women**, not the athletes.

2  Plaintiff cannot meet his burden to prove by **clear and convincing evidence** that

3  Shed Media acted with actual malice simply by pointing to—and twisting—a single

4  press release.  Thus, his right of publicity claim necessarily fails.

5         **2.      Plaintiff's Trademark Infringement Claim Fails.**

6         To state a claim for trademark infringement in violation of 15 U.S.C.

7  § 1125(a),[2] Plaintiff must prove that:  (1) he owns a mark; (2) he used the mark prior

8  to Shed Media's alleged use; (3) Shed Media used the allegedly infringing mark in

9  interstate commerce without his consent; and (4) Shed Media's use is likely to cause

10  consumer confusion.  *See*, *e.g.*, *Century 21 Real Estate v. Sandlin*, 846 F.2d 1175,

11  1178 (9th Cir. 1998).  Plaintiff's claim fails because (1) he has not pointed to any

12  confusingly similar mark used by Shed Media, (2) any alleged use of his marks by

13  Shed Media is a nominative fair use, and (3) Plaintiff's claims are barred by the First

14  Amendment.

15         **a.      Plaintiff Has Not Pointed To Any Confusingly Similar Mark.**

16         The third element of a claim for trademark infringement is the defendant's use

17  of an infringing mark in interstate commerce.  Plaintiff skips this step, and goes

18  straight to the fourth step, likelihood of confusion.  Plaintiff has failed to explain a

19  fundamental element of his claim—*i.e.*, what mark Shed Media has used that is

20  confusingly similar to his marks.  In other words, argues that Shed Media uses a

21  mark that is confusingly similar to his trademarks in his name and likeness but never

22  identifies the marks that he claims Shed Media is using.

23         Plaintiff does this because identifying the "marks" at issue would highlight

24  the absurdity of his claim.  Plaintiff argues that "while Defendants so far have made

25  no explicit mention of Plaintiff's name, Defendants have clearly used Plaintiff's

_____

26
[2] Plaintiff has attempted to state three distinct claims for violation of § 1125(a):  (1)
27  trademark infringement, (2) false advertising, and (3) false endorsement.  Only the
   trademark infringement claim is at issue in this motion.

28

identity" because Govan, Plaintiff's ex-girlfriend and the mother of his children, appears of the Show.  [Motion 17:5-8.]  In other words, the allegedly infringing "marks" are "Laura Govan" and "Basketball Wives."  Conducting the likelihood of confusion analysis with these marks dooms Plaintiff claim to failure.

"Where. . . two marks are entirely dissimilar, there is no likelihood of confusion. . . . Nothing further need be said." *Brookfield Comm'ns v. West Coast Ent.*, 174 F.3d 1036, 1054 (9th Cir. 1999).  *See also Pirone v. Macmillan, Inc*., 894 F.2d 579 (2nd Cir. 1990) (applying the rule stated in *Brookfield* in the celebrity context).  The marks that Shed Media allegedly uses—"Laura Govan" and "Basketball Wives"— are entirely dissimilar from Plaintiff's alleged marks.  Thus, Plaintiff's trademark infringement claim must fail.

### b. <u>The Nominative Fair Use Doctrine Bars Plaintiff's Claim.</u>

Where a defendant uses a plaintiff's mark "to describe the plaintiff's product," courts apply a nominative fair use analysis that does not follow the traditional likelihood of confusion analysis because such use "lies outside the strictures of trademark law" in that "it does not implicate the source-identification function." *New Kids on the Block*, 971 F.2d 302, 308 (9th Cir. 1992) (nominative use for the defendant newspapers to use the trademark "New Kids on the Block" to describe the band).  *See also Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1151 (9th Cir. 2002).

> The nominative fair use defense applies where three elements are met: First, the [plaintiff's] product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the [plaintiff's] product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

971 F.2d at 308.  Shed Media easily meets this test.

-21-

First, there is no reasonable way to refer to Plaintiff without using his name. "When an individual obtains a service mark in his own proper name, it becomes difficult, if not impossible, to refer to the individual without using his or her trademarked name." *Dick Clark v. America Online, Inc.*, 2000 U.S. Dist. LEXIS 17368 at *16 (C.D. Cal. Nov 30, 2000).  In such a circumstance, "allowing the trademark holder exclusive rights would allow the language to 'be depleted in much the same way as if generic words were protectable.'" *Playboy Enterprises, Inc. v. Welles*, 279 F.3d 796, 802 (9th Cir. 2002) (quoting *New Kids*, 971 F.2d at 306).

Second, although Shed Media does not currently use Plaintiff's name, if and when it does, it will use Plaintiff's name only as necessary to refer ***to Plaintiff*** in the context of telling its story about its women protagonists.  It will not, for example, do what the Ninth Circuit found to be objectionable in *Playboy Enterprises* and wallpaper the background of a scene with the words "Gilbert Arenas" repeated over and over, nor will it promote the Show as "Gilbert Arenas's *Basketball Wives: Los Angeles*." *See Playboy Enterprises*, 279 F.3d at 804 (holding that "[t]he repeated depiction of 'PMOY '81'" as the wallpaper for the defendant's website was not necessary to describe" her as a former "Playmate of the Year").

Finally, such use of Plaintiff's name and/or likeness would in no way support sponsorship or endorsement by Plaintiff, but rather would be incidental to the telling of Govan's story.  As explained in Section III(C)(1)(c)(4), *supra*, given the publicly tumultuous nature of Plaintiff's relationship with Govan, no reasonable person would believe that the fact that Govan appears on the Show means that Plaintiff endorses it.[3]  Because all three factors apply here, the nominative fair use defense bars Plaintiff's trademark infringement claim.

---

[3] Plaintiff does not dispute that the first two elements of the nominative fair use test are met here.  Instead, he claims, much like he did in connection with the actual malice analysis, *supra*, that Shed Media somehow suggests that Plaintiff endorses the Show.  Because Plaintiff's argument is identical to his actual malice argument, Shed Media, for simplicity's sake, does not address it again here.

-22-

### c.     <u>Plaintiff's Claim Is Barred By The First Amendment.</u>

The First Amendment defense applies equally to Plaintiff's trademark infringement claim as it does to Plaintiff's right of publicity claim. *E.S.S. Enter't 2000 v. Rock Star*, 547 F.3d 1095, 1101 (9th Cir. 2008). Thus, for the same reasons asserted in section III(C)(1)(c), *supra*, Plaintiff's trademark infringement claim fails. Briefly, in *Mattel, Inc.*, the Ninth Circuit held that courts must "construe the Lanham Act to apply to artistic works *only* where the public interest in avoiding consumer confusion *outweighs* the public interest in free expression." *Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 807 (9th Cir. 2003) (emphasis in the original and internal quotations omitted).[4] An expressive work's use of a trademark is not actionable (1) "unless the [use of the mark] has no artistic relevance to the underlying work whatsoever"; or (2) "if it has some artistic relevance, unless [it] explicitly misleads as to the source or the content of the work." *Mattel, Inc.* 296 F.3d at 902 (internal quotations omitted).

Both of these elements are clearly met here. First, the "no relevance" standard is to be taken literally such that the "level of relevance merely must be above zero." *Rock Star*, 547 F.3d at 1100. An allegedly infringing work need not be "about" the alleged trademark in order to surpass this low threshold. *Id.* As discussed in Section III(C)(1)(c)(1), the Show does relate to Plaintiff, and certainly meets the low "no relevance" standard. Second, as explained Section III(C)(1)(c)(4), no reasonable person could find that the Show misleads viewers into believe that Plaintiff is its source or sponsor. Thus, Plaintiff's trademark infringement claim is barred by the First Amendment.

### D.     <u>Plaintiff Cannot Establish That He Will Be Irreparably Harmed.</u>

---

[4] While *MCA Records* dealt with the use of a trademark in the title of a work, its analysis applies equally to "to the use of a trademark in the body of the work." *Rock Star*, 547 F.3d at 1099.

"Under *Winter*, plaintiffs must establish that irreparable harm is likely, not just possible." *Alliance For The Wild Rockies v. Cottrell*, 632 F.3d, 1127 1131 (9th Cir. 2011). Plaintiff does not present any evidence of actual or likely harm. Instead, Plaintiff argues, citing *Ali v. Playgirl, Inc.*, 447 F. Supp. 723, 729 (S.D.N.Y. 1978), that irreparable harm is likely because he "is deprived of his sole right to exploit his property interest in his identity", will suffer "reputational harm", and "damages would be difficult" to calculate. [Motion 15:3-7.] In other words, Plaintiff asks this Court to presume irreparable harm. Plaintiff can not rely on such a presumption after *Winter*. *See*, *e.g.*, *Kerr Corp. v. North Am. Dental Wholesalers, Inc.*, No. 11-0313, 2011 U.S. Dist. LEXIS 61779 at *6 (C.D. Cal. June 9, 2011) ("Kerr nonetheless demonstrates only a minimal effort to demonstrate irreparable harm, relying heavily on the idea that a plaintiff who demonstrates a likelihood of success on the merits of a trademark  infringement claim is entitled to a presumption of irreparable harm. This standard, however, no longer applies in light of the *Winter* case. . . ." (internal citations omitted)).

Moreover, even if such a presumption were applicable here, it is easily rebutted for the same reason that Plaintiff cannot prove damages as an element of his right of publicity claim. He explicitly admits that Govan's appearance on the Show is to his benefit and states that the series "makes [him] laugh." [Alter Decl. ¶¶ 11-12, Exs. P-Q.] Thus, any claim of irreparable harm is directly contrary to Plaintiff's previous public statements.

**E.**     **The Balance Of The Hardships Favors Shed Media.**

Plaintiff has admitted that there is no harm to him from Govan's appearance on the show, and, in fact, that the Show will actually benefit him by reducing the support payments that he must make to Govan. [Alter Decl. ¶¶ 11-12, Exs. P-Q.] By contrast, Shed Media will be severely injured if an injunction issues.

First, Shed Media will be faced with extreme economic harm and reputational injury. VH1 would likely claim that Shed Media would be in breach of its

agreement to timely deliver the Show.  Such a breach could result in severe monetary losses to Shed Media in the form of lost payments and potential monetary damages caused as a result of the breach, including lost advertising revenues, and non-monetary losses in the form of loss of reputation in the industry.  [Helberg Decl. ¶¶ 3-5]

Second, Plaintiff seeks a broad injunction silencing Shed Media based on claims that have a minute, if any, chance of success.  Permitting Plaintiff to curtail Shed Media's First Amendment rights based on such questionable claims would result in undeniable injury to Shed Media.  "Loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Third, Plaintiff ignores the fact that the injunction he seeks would likely harm non-parties to this lawsuit.  Were an injunction to issue, VH1, upon which the Show will air, would likely claim harm on the grounds that  it will lose advertising revenue and because its First Amendment rights will be curtailed, much like Shed Media's. [Helberg Decl. ¶¶ 3-4]  Weighing the potential financial and First Amendment injuries to Shed Media and non-party VH1 (and the fact that Plaintiff has admitted that airing the Show is good for him) counsels against issuing an injunction.

## IV.  CONCLUSION

For the reasons explained above, Shed Media respectfully requests that the Court deny Plaintiff's motion for preliminary injunction.

Dated:  August 2, 2011

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


By _____/s *James E. Curry*_____
                         JAMES E. CURRY

                 Attorneys for Defendant
                 SHEA MEDIA US INC.