# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GILBERT J. ARENAS, JR., <br><br> Plaintiff, <br><br> v. <br><br> SHED MEDIA US INC., et al., <br><br> Defendants. | Case No. CV 11-05279 DMG (PJWx) <br><br> **ORDER RE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND DEFENDANT'S MOTION TO STRIKE** |

This matter is before the Court on Plaintiff Gilbert J. Arenas, Jr.'s Motion for Preliminary Injunction and Defendant Shed Media US Inc.'s Motion to Strike. A hearing was held on August 22, 2011. Having duly considered the respective positions of the parties, as presented in their briefs and at oral argument, the Court now renders its decision. For the reasons set forth below, Plaintiff's Motion is DENIED and Defendant's Motion is GRANTED.

## I.
## PROCEDURAL HISTORY

On June 23, 2011, Arenas filed this action against Defendants Shed Media, Laura Govan, and Does 1 through 10. On July 25, 2011, Arenas filed a Motion for Preliminary

Injunction [Doc. # 18].  Shed Media filed its Opposition on August 2, 2011 [Doc. # 22].  On August 9, 2011, Arenas filed his Reply [Doc. # 26].

Shed Media filed a Motion to Strike Arenas' right of publicity claims under California's anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16, on August 1, 2011 [Doc. # 19].  Arenas filed his Opposition on August 8, 2011 [Doc. # 25].  On August 15, 2011, Shed Media filed its Reply [Doc. # 27].

## II.

## FACTUAL BACKGROUND

Arenas is a professional basketball player for the Orlando Magic who goes by the nicknames Agent Zero, Agent Arenas, and Hibachi.  (Arenas Decl. ¶ 2.)  He has played in the National Basketball Association ("NBA") since 2001, where he was named an NBA "All-Star" three times and received the 2003 "NBA Most Improved Player Award," among other accolades.  (*Id*. ¶¶ 3-5.)  Arenas and Govan were previously in a romantic relationship and have four children together.  Their relationship has since ended.  (*Id*. ¶ 7.)

Shed Media produces the *Basketball Wives* series, which airs on the VH1 network.  (Demyanenko Decl. ¶ 2.)  It comprises a cast of women, most of whom have or have had a romantic relationship with a professional basketball player.  The show is about the women's relationships with one another and their lives.  (*Id*. ¶ 3.)  Although basketball players are mentioned as part of the storyline insofar as they are part of the women's lives, players that do not appear on the show as cast members are not themselves the focus of the storyline.  (*Id*. ¶ 4.)  A spinoff of the *Basketball Wives* series, *Basketball Wives: Los Angeles* ("*BWLA*"), is scheduled to air for the first time on August 29, 2011.  *BWLA* will follow the general parameters of the *Basketball Wives* series.  (*Id*. ¶ 6.)

Govan will appear on *BWLA*.  (*Id*.)  Arenas has not authorized Govan to use his identity or trademarks.  (Arenas Decl. ¶ 8.)  *BWLA*'s press releases describe Govan as the sister of Gloria Govan, the fiancée of Los Angeles Lakers player Matt Barnes.  (Acord

1 Decl. ¶ 4.) Although the press releases cite Govan's "kids and brand new baby," they do
2 not refer to Arenas. (*Id.*)
3    Arenas raises four causes of action against Shed Media and Govan under the
4 Lanham Act, 15 U.S.C. § 1125, for trademark infringement, trademark dilution, false
5 advertising, and false endorsement. In addition, Arenas charges Defendants with
6 common law and statutory misappropriation of likeness and right of publicity, Cal. Civ.
7 Code § 3344, as well as violations of California's Unfair Competition Law ("UCL"), Cal.
8 Bus. & Prof. Code § 17200.

## III.
## LEGAL STANDARDS

### A.    Preliminary Injunctions

A plaintiff seeking injunctive relief must show that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Toyo Tire Holdings Of Ams. Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 982 (9th Cir. 2010) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). An injunction is also appropriate when a plaintiff raises "serious questions going to the merits," demonstrates that "the balance of hardships tips sharply in the plaintiff's favor," and "shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)). An injunction is an exercise of a court's equitable authority, which should not be invoked as a matter of course, and "only after taking into account all of the circumstances that bear on the need for prospective relief." *Salazar v. Buono*, __ U.S. __, 130 S.Ct. 1803, 1816, 176 L.Ed.2d 634 (2010).

### B.    Anti-SLAPP Motions

California's statute prohibiting Strategic Lawsuits Against Public Participation (the "anti-SLAPP statute"), Cal. Civ. Proc. Code § 425.16, provides a mechanism for the

"early dismissal of meritless lawsuits aimed at chilling expression through costly, time-consuming litigation." *Northon v. Rule*, 637 F.3d 937, 938 (9th Cir. 2011) (citing *Gardner v. Martino*, 563 F.3d 981, 986 (9th Cir. 2009)). Under the anti-SLAPP statute, defendants may bring a special motion to strike a cause of action, which should be granted if (1) the cause of action arises from any act by the defendants in furtherance of their free speech rights under the federal or state constitution; (2) the act is "in connection with a public issue"; and (3) the plaintiff fails to establish a probability that he will prevail on the claim. Cal. Civ. Proc. Code § 425.16(b)(1).

To establish a probability of prevailing on a claim, the plaintiff must meet a standard "comparable to that used on a motion for judgment as a matter of law." *Price v. Stossel*, 620 F.3d 992, 1000 (9th Cir. 2010) (citing *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 840 (9th Cir. 2001)). Thus, the plaintiff "must demonstrate that the complaint is legally sufficient and supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." *Id.* (quoting *Metabolife*, 264 F.3d at 840) (internal quotation marks omitted). If the plaintiff fails to present a sufficient legal basis for the claims or if the evidence offered is insufficiently substantial to support a judgment in favor of the plaintiff, then the defendant's anti-SLAPP motion should be granted. *Id.* (quoting *Metabolife*, 264 F.3d at 840).

## IV.

## DISCUSSION

### A.  Arenas' Motion For Preliminary Injunction

Arenas seeks injunctive relief based on his fifth cause of action for common law misappropriation of likeness (Pl.'s Mot. at 5) and first cause of action for trademark infringement (*id*. at 16). He seeks to enjoin Defendants and those in concert with them from (1) using his alleged trademarks in association with any reality television show; and, if Govan appears in the show, (2) using "Basketball Wives" or any other term that would suggest affiliation with basketball players in the title, promotional text, or the show itself; and (3) using any other means to suggest affiliation with basketball players, such as

including more than two participants who are known to be affiliated with basketball players. (*Id*. at 1-2.)

### 1. Arenas' Likelihood Of Success On The Merits

#### a. Common Law Appropriation Of Identity

California common law recognizes "the right of a person whose identity has commercial value—most often a celebrity—to control the commercial use of that identity." *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1183 (9th Cir. 2001) (quoting *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1098 (9th Cir. 1992)). To sustain a common law claim for commercial misappropriation, a plaintiff must prove "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of [the] plaintiff's name or likeness to [the] defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664, 679, 105 Cal. Rptr. 3d 98 (2010) (quoting *Eastwood v. Superior Court*, 149 Cal. App. 3d 409, 417, 198 Cal. Rptr. 342 (1983)).

Shed Media does not dispute that it lacks Arenas' consent. The Court discusses Arenas' potential injury below in the context of irreparable harm. Thus, in examining Arenas' likelihood of success on the merits, the Court confines its analysis to the first two elements of the claim as well as Shed Media's asserted First Amendment defense.

#### i. Arenas' Right Of Publicity

Whether Shed Media will use Arenas' identity and appropriate his name or likeness is difficult to predict based on the current record. Arenas has not provided the Court with a copy of any *BWLA* episode. Thus, the Court can only speculate as to the show's likely content based on Shed Media's declarations and promotional materials. As Arenas concedes, "Defendants use care to avoid explicit reference to Plaintiff's name in the advertisements." (Compl. ¶ 24.) Shed Media nonetheless insists that "future promotional materials could certainly refer to Govan's prior relationship with Plaintiff." (Def.'s Opp'n at 6.)

In any event, given the subject matter of the show, it is likely that Govan will discuss Arenas in the context of their former relationship when she appears on *BWLA*. Although the show's focus is on the wives and girlfriends, its *raison d'être*—distinguishing *BWLA* from such shows as *The Real Housewives of Orange County*—is its protagonists' personal relationships with professional basketball players like Arenas. The question then is whether Govan's likely on-air conversations about Arenas (and any future promotional materials relating thereto) constitute the use of Arenas' identity as a celebrity. The Court concludes that it does.

Arenas asserts that the term "identity" should be "broadly construed," and that "the explicit use of a celebrity's name or face is not necessary." (Pl.'s Mot. at 5 (citing *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395 (9th Cir. 1992); *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831 (6th Cir. 1983) (applying Michigan common law); *Motschenbacher v. R.J. Reynolds Tobacco Co.*, 498 F.2d 821 (9th Cir. 1974)).) As a general proposition, this is correct. California recognizes "an injury from 'an appropriation of the *attributes* of one's identity.'" *Midler v. Ford Motor Co.*, 849 F.2d 460, 463 (9th Cir. 1988) (quoting *Motschenbacher*, 498 F.2d at 824) (emphasis added).

Though broad, the concept of celebrity identity is not unbounded. Crucial to the appropriation of a celebrity's identity is that the publication *identify* the celebrity—either by directly using his name or image or "by emphasizing signs or symbols associated with him." *Id*. Thus, the "female-shaped robot . . . wearing a long gown, blond wig, and large jewelry" that was "in the process of turning a block letter on a game-board" on "what looks to be the Wheel of Fortune game show set" uniquely conjured up Vanna White. *White*, 971 F.2d at 1399. Likewise, the use of Johnny Carson's catchphrase "Here's Johnny" violated the entertainer's right of publicity in *Carson*, just as the use of a vehicle with markings peculiar to Lothar Motschenbacher's racecar violated the driver's right of publicity in *Motschenbacher*.

Even the direct use of a celebrity's name will not violate his right of publicity, however, if the use does not appropriate his "identity *as* a celebrity." *Carson*, 698 F.2d at

837 (emphasis added).  Thus, the Sixth Circuit hypothesized that the "John William Carson Portable Toilet" would not give rise to a cause of action for Johnny Carson.  *Id*.  Here, in contrast, Defendants' likely use of Arenas' name is in the context of a show about "Basketball Wives" that features famous basketball players' current and former wives and girlfriends.  If, as is probable, Govan mentions Arenas by name on *BWLA*, it will be in the context of his status as a famous basketball player.  Consequently, Arenas is likely to prove the first two elements of commercial misappropriation.

Shed Media maintains that "[n]o reasonable person could find that the combination of [*BWLA*'s] title and Govan's appearance in [*BWLA*] constitutes a misappropriation of Plaintiff's name or likeness, or even his identity."  (Def.'s Opp'n at 11.)  If, in her appearances on the show, Govan does *not* discuss Arenas, then the Court agrees with Shed Media that her inclusion alone is insufficient to invoke Arenas' identity as a celebrity.  Govan is the sister of one of the other basketball "wives."  As such, her appearance on the show, if stripped of any connection to Arenas, is explicable.  Shed Media has advertised Govan's role only in the context of her sister.

Arenas points out that "within the same day of the official press release, other media outlets caught on to the connection [between Govan and Arenas], and disseminated Plaintiff's name to Defendants' benefit."  (Pl.'s Mot. at 7 (citing Amato Decl., Exs. A, C, D).)  Yet, this is no more surprising than it is relevant.  In an age of tabloid journalism and celebrity obsession, news outlets frequently uncover and publicize connections between celebrities.  For example, in the run-up to the 2008 election, it was widely reported that then-Senator Obama was a distant relative of then-Vice President Cheney, though presumably neither individual sought to be associated with the other.  *See, e.g.*, Hasani Gittens, *Dissing Cousins:  Obama, Cheney, Bush Related*, N.Y. Post, Oct. 17, 2007, at 12.

The problem with Shed Media's position is that it rests on the improbable assumption that Govan will refrain from discussing her relationship with Arenas on *BWLA*.  (*But see* Demyanenko Decl. ¶ 4 ("The basketball players themselves may be

mentioned as part of the women's describing their own lives—perhaps mentioning . . . the awkwardness of seeing an ex-boyfriend.").) Given that Govan is likely to mention Arenas at some point during her appearances on the show, Defendants are likely to appropriate his identity for commercial gain.

That the show focuses on "the women's relationships with one another and their lives" (*id*. ¶ 3) rather than on Arenas is immaterial. "It is not important *how* the defendant has appropriated the plaintiff's identity, but *whether* the defendant has done so." *White*, 971 F.2d at 1398. In *Midler*, the commercial at issue purveyed Ford automobiles. It did not employ Bette Midler's name or image. Still, the "celebrated chanteuse" showed that her right of publicity had been violated because a song performed by a singer imitating Midler's voice accompanied the ad. *Midler*, 849 F.2d at 461.

Having determined that Govan's appearance on *BWLA* is likely to result in an appropriation of Arenas' name, if not his likeness, the Court next considers whether any defenses would prevent Arenas from succeeding in his claim that there has been a *mis*appropriation.

### ii. Defendants' First Amendment Defense

Under California law, a right of publicity claim is subject to two affirmative defenses deriving from First Amendment protections: the "transformative use" defense and the "public interest" defense. *Hilton v. Hallmark Cards*, 599 F.3d 894, 909 (9th Cir. 2010). Shed Media argues that both apply. (Def.'s Opp'n at 13.) The Court agrees.

#### A. Transformative Use Defense

To be entitled to a "transformative use" defense, a defendant must show "that the work is protected by the First Amendment inasmuch as it contains significant transformative elements or that the value of the work does not derive primarily from the celebrity's fame." *Id*. (quoting *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 407, 106 Cal. Rptr. 2d 126 (2001)). "The potential reach of the transformative use defense is broad." *Id*. It entails, in effect, "a balancing test between the First

Amendment and the right of publicity." *Id*. (quoting *Winter v. DC Comics*, 30 Cal. 4th 881, 885, 134 Cal. Rptr. 2d 634 (2003)).

The balancing test "requires the court to examine and compare the allegedly expressive work with the [use of the plaintiff's identity] to discern if the defendant's work contributes significantly distinctive and expressive content." *Kirby v. Sega of Am., Inc.*, 144 Cal. App. 4th 47, 61, 50 Cal. Rptr. 3d 607 (2006). "When the value of the work comes principally from some source other than the fame of the celebrity—from the creativity, skill, and reputation of the artist—it may be presumed that sufficient transformative elements are present to warrant First Amendment protection." *Comedy III Prods.*, 25 Cal. 4th at 407. On the other hand, "when an artist's skill and talent is manifestly subordinated to the overall goal of creating a conventional portrait of a celebrity so as to commercially exploit his or her fame, then the artist's right of free expression is outweighed by the right of publicity." *Id*. at 408.

On the record currently before the Court, it appears that any references in *BWLA* to Arenas will be incidental to the show's plot as a whole. At its core, the show is about the women who have or have had relationships with basketball players rather than the players themselves. Thus, the show appears to be transformative.

Arenas contends that *BWLA* uses his identity "solely to attract attention to the show" because the show "is not actually related to [him]." (Pl.'s Reply at 5-6 (emphasis omitted).) This is simply untrue. Unlike Vanna White and Samsung videocassette recorders or Bette Midler and Ford cars, there is an obvious connection between Arenas and *BWLA*. Shed Media's show is about women who have dated or married basketball players. Arenas is a basketball player who dated one of *BWLA*'s cast members. While the show is not predominantly about Arenas,[1] it is not so unconnected to him as to vitiate Shed Media's First Amendment defense.

---

[1] Even if the show *were* predominantly about Arenas, it would still qualify for protection under the public interest defense. A contrary rule would chill a variety of expression, such as unauthorized biographies, that enjoys well-established First Amendment protection.

### B. Public Interest Defense

Under the public interest defense, "no cause of action will lie for the publication of matters in the public interest, which rests on the right of the public to know and the freedom of the press to tell it." *Hilton*, 599 F.3d at 912 (quoting *Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790, 793, 40 Cal. Rptr. 2d 639 (1995)). "This First Amendment defense extends 'to almost all reporting of recent events,' as well as to publications about 'people who, by their accomplishments, mode of living, professional standing or calling, create a legitimate and widespread attention to their activities.'" *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001) (quoting *Eastwood v. Superior Court*, 149 Cal. App. 3d 409, 422, 198 Cal. Rptr. 342 (1983)). "[T]he accomplishments . . . of those who have achieved a marked reputation or notoriety by appearing before the public such as . . . *professional athletes*, . . . may legitimately be mentioned and discussed in print or on radio and television." *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 410, 114 Cal. Rptr. 2d 307 (2001) (quoting *Carlisle v. Fawcett Publ'ns, Inc.*, 201 Cal. App. 2d 733, 746-47, 20 Cal. Rptr. 405 (1962)) (emphasis in *Gionfriddo*). First Amendment protection is "not limited to news stories on current events: 'Entertainment features receive the same constitutional protection as factual news reports.'" *Stewart*, 181 Cal. App. 4th at 681.

Arenas suggests that any discussion of his family life is not sufficiently related to his celebrity to render *BWLA*'s use of his identity a matter of public concern. (*See* Pl.'s Mot. at 10; Pl.'s Reply at 6.) This contention is belied by the tens of thousands of Twitter users who follow Arenas as he tweets about a variety of mundane occurrences. (*See, e.g.*, Alter Decl., Ex. O at 118 ("dont u hate waking up doing the same thing..wash face..brush teeth..pee..take shower(well sum of us)...put on clothes...eat...etc").) "Public interest attaches to people who by their accomplishments or mode of living create a bona fide attention to their activities." *Hilton*, 599 F.3d at 912 (quoting *Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536, 542, 18 Cal. Rptr. 2d 790 (1993)).

1       Finally, Arenas maintains that any First Amendment defense fails because Defendants acted with actual malice. (Pl.'s Mot. at 11-13.) To avoid a First Amendment defense to a right of publicity claim, a plaintiff must "provide clear and convincing evidence that [the] defendants had acted with actual malice." *Stewart*, 181 Cal. App. 4th at 689. In other words, the plaintiff must prove that the defendants "published defamatory statements . . . either with knowledge of their falsity or with reckless disregard for the truth." *Id.* at 681 (citing *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). Arenas identifies neither defamatory nor false statements that Govan is likely to make about him on the show. Accordingly, he fails to carry his burden of showing actual malice at this time.

      At the hearing, Arenas' counsel clarified that Arenas would be satisfied with an injunction proscribing Defendants from using Arenas' name in BWLA promotional materials. Although the Court considers Arenas' claims primarily in the context of the show itself, the analysis is no different with respect to BWLA promotional materials. "Constitutional protection extends to the truthful use of a public figure's name and likeness in advertising which is merely an adjunct of the protected publication and promotes only the protected publication." *Cher v. Forum Int'l, Ltd.*, 692 F.2d 634, 639 (9th Cir. 1982) (citing *Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal. 3d 860, 873, 160 Cal. Rptr. 352 (1979) (Bird, J. concurring)). Thus, the *BWLA* advertising "is not actionable under an appropriation of publicity theory so long as the advertising does not falsely claim that the public figure endorses [*BWLA*]." *Id*.

      Therefore, the Court concludes that Arenas is unlikely to succeed on his common law commercial misappropriation claim. The Court now turns to Plaintiff's trademark infringement claim.

                **b.**    **Trademark Infringement**

      Arenas has a muddled trademark infringement claim. He fails to articulate a coherent theory of infringement or clearly identify the marks that allegedly infringe his own. Arenas asserts ownership in the marks GILBERT J. ARENAS, JR., GILBERT

ARENAS, GIL ARENAS, and any variant of these marks sufficient to identify him. (Compl. ¶ 20.) He then claims that "the very presence of [Govan] and the title of the show is an obvious reference to Plaintiff and use of Plaintiff's likeness." (*Id*. ¶ 24.) He also alleges that Defendants are using or have threatened to use his marks in commerce in connection with *BWLA* advertising and promotion. (*Id*. ¶ 25.)

### i. Defendants' Use Of "Basketball Wives"

To succeed on a claim of trademark infringement under the Lanham Act, a plaintiff must prove that the defendant's use of his mark is likely to cause consumer confusion. *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1030 (9th Cir. 2010) (quoting *Brookfield Commc'ns v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1053 (9th Cir. 1999)). Eight nonexclusive factors guide this inquiry:

> (1) the similarity of the marks; (2) the strength of the plaintiff's mark; (3) the proximity or relatedness of the goods or services; (4) the defendant's intent in selecting the mark; (5) evidence of actual confusion; (6) the marketing channels used; (7) the likelihood of expansion into other markets; and (8) the degree of care likely to be exercised by purchasers of the defendant's product.

*Id*. (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)).[2] The test is applied flexibly and the relative importance of each individual factor is case-specific. *Id*. at 1030-31.

Insofar as Arenas is arguing that Shed Media is infringing his marks through the title of its show, this argument is easily dismissed. Although Arenas' marks are strong,

---

[2] Arenas advocates use of the modified *Sleekcraft* factors articulated in *Downing*: (1) the level of recognition that the plaintiff has among the segment of the society for whom the defendant's product is intended"; (2) "the relatedness of the fame or success of the plaintiff to the defendant's product"; (3) "the similarity of the likeness used by the defendant to the actual plaintiff"; (4) "evidence of actual confusion"; (5) "marketing channels used"; (6) "likely degree of purchaser care"; (7) the "defendant's intent on selecting the plaintiff"; and (8) "likelihood of expansion of the product lines." *Downing*, 265 F.3d at 1007-08. This test is inappropriate here because Defendants disclaim use of Arenas' "likeness," *i.e.*, his image—either actual or suggested.

-12-

they are completely dissimilar to Shed Media's title.  No one would confuse Arenas with a basketball wife.  Arenas provides no evidence of actual confusion.  Nor does Arenas provide evidence that he competes for celebrity endorsements with Shed Media or that he has plans to develop a reality television series about women who date basketball players.  In short, Arenas has virtually no chance of succeeding on an infringement claim based on the mark "Basketball Wives."

### ii. Nominative Fair Use

Arenas also claims infringement based on Defendants' direct use of his name on *BWLA*.  The *Sleekcraft* analysis does not apply "where a defendant uses the mark to refer to the trademarked good itself."  *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1175 (9th Cir. 2010) (citations omitted).  Such use, described as "nominative fair use," is generally not infringement.  *Id*.  In cases involving a nominative fair use defense, courts consider whether "(1) the product was 'readily identifiable' without use of the mark; (2) [the] defendant used more of the mark than necessary; or (3) [the] defendant falsely suggested he was sponsored or endorsed by the trademark holder."  *Id*. at 1175-76.

It would be virtually impossible for Defendants to refer to Arenas without using his name.  Because Defendants have not yet used any of Arenas' marks in commerce, it is difficult to predict at this juncture whether they will eventually use more of his marks than necessary.  Finally, and most importantly, allowing Govan to talk about her relationship with Arenas on *BWLA* and permitting Shed Media to advertise that its show will feature such discussions in no way suggests that Arenas endorses the show.  To the contrary, common sense suggests that a celebrity may not agree with his ex-girlfriend's opinion of him.  *See id*. at 1176 ("In performing this analysis, our focus must be on the 'reasonably prudent consumer' in the marketplace." (internal quotation marks omitted)).

Thus, Arenas is unlikely to succeed on his trademark infringement claim.  As Arenas has failed to show a likelihood of success or even serious questions going to the

-13-

merits of any of his claims, he is not entitled to injunctive relief. The remaining factors also do not support an injunction.

### 2. Arenas' Likelihood Of Irreparable Harm

Arenas contends that he will suffer irreparable harm in the absence of injunctive relief because he will suffer reputational harm. In particular, he describes the *Basketball Wives* franchise as "one that prides itself on its coarse brand of drama," featuring "cat fights" and "infidelity issues." (Pl.'s Mot. at 9.) Arenas argues that Defendants' use of his identity to associate him with "such a disreputable show" will lessen his reputation. (*Id.*)

Shed Media provides a treasure trove of newspaper articles about and tweets by Arenas that, taken as a whole, convince the Court that Plaintiff's reputation will suffer no serious blow if *BWLA* airs as scheduled. For example, to paraphrase Shed Media, it is difficult to see how an association with "cat fights" will tarnish Arenas' reputation when he has been publicly associated with potential gunfights. (Def.'s Opp'n at 7.) Arenas made national headlines at the beginning of 2010 over an incident in the Washington Wizards locker room in which he drew a gun on a teammate during a dispute over a gambling debt, and ultimately pled guilty to carrying a pistol without a license. (Alter Decl. ¶¶ 2-3, Exs. F, G.) Arenas has publicized on Twitter his views of women and other groups—opinions that would be characterized by many, if not most, people as crude and offensive. (*See id.*, Exs. O, P.)

Moreover, Arenas has already associated himself with the show by tweeting directly or indirectly about Govan's appearance on it. In these tweets, Arenas expresses his opinion that he "[doesn't] care what [Govan] does" because "if she gets a job [he pays] less money to her." (*Id.*, Ex. P at 134.) According to Arenas, most basketball players do not know that (1) "they" (presumably ex-wives and ex-girlfriends) cannot lie about basketball players on television because the players can sue the show; and (2) the basketball players pay less money if "they" have a job. (*Id.*, Ex. P at 133.) In addition, Arenas opines that he "care[s] more about [watching people] plank [*i.e.*, lie prone] th[a]n

-14-

my ex on tv." (*Id.*, Ex. P at 121.) Arenas' own tweets calling attention to Govan's upcoming appearance on *BWLA* undermine his claim that he will be injured by an association with the show.

Quoting *Brandt v. Superior Court*, 67 Cal. 2d 437, 443, 62 Cal. Rptr. 429 (1967), Arenas asserts that "'choir boy' or not, even a 'man with a very bad reputation may be libeled.'" (Pl.'s Reply at 5.) While true, that is beside the point. The issue is whether Arenas' reputation will suffer irreparable injury unless the Court grants injunctive relief. Given Arenas' highly publicized behavior, it is not apparent on this evidentiary record that any association with *BWLA* will seriously affect his reputation such that damages would not adequately compensate him. Thus, Plaintiff fails to show a likelihood of irreparable harm.

### 3. The Balance Of Equities

The balance of equities tips sharply in Shed Media's favor. As reported by the *Washington Post*, Arenas has already appeared on a radio show to discuss his break-up with Govan, "blasting his ex-fiancee for trying to 'destroy' him." (Alter Decl. ¶ 8, Ex. L.) He has already publicly associated himself with Govan's appearance on *BWLA*. The potential reputational harm to him is slight.

Shed Media, in contrast, would face tremendous hardship if it were subjected to an injunction. VH1 would likely claim that it was in breach of their agreement to timely deliver the show, which would cause Shed Media to lose payments, subject it to liability for lost advertising revenues, and injure its reputation in the industry. (Helberg Decl. ¶¶ 3-5.)

### 4. The Public Interest

Finally, the Court must consider the public interest. "Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Sammartano v. First Judicial District Court*, 303 F.3d 959, 974 (9th Cir. 2002) (citations omitted). Although the public also has an interest in intellectual property protection, that interest is curtailed where, as here, any

purported intellectual property interest is highly attenuated. Therefore, the public interest weighs against the issuance of an injunction.

**B.     Shed Media's Anti-SLAPP Motion**

Having concluded that Arenas is unlikely to prevail on his right of publicity claim, the Court must grant Shed Media's anti-SLAPP motion if the conduct at issue was in furtherance of Defendants' free speech rights in connection with a matter of public concern. The Court finds that it was.

An act suffices to further the exercise of free speech rights if "the defendant's activity is communicative." *Hilton*, 599 F.3d at 904. That is clearly the case here. For an act to be in connection with a matter of public concern, it "need not involve questions of civic concern; social or even low-brow topics may suffice." *Id*. at 905. Thus, the second element is also met. Consequently, the Court grants Shed Media's Motion to Strike.

## V.

## CONCLUSION

In light of the foregoing, Arenas' Motion for Preliminary Injunction is **DENIED**, Shed Media's Motion to Strike is **GRANTED**, and Arenas' fifth cause of action for right of publicity is hereby **DISMISSED** with leave to amend. Arenas shall file any amended complaint on or before **September 6, 2011**. Defendants shall file their responsive pleadings within 15 days thereafter. The August 29, 2011 hearing on Shed Media's Motion to Strike is hereby **VACATED**.

**IT IS SO ORDERED.**

DATED:    August 22, 2011

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE